# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2006-SA-01088-SCT

*IN RE: JIM HOOD, ATTORNEY GENERAL, EX REL., STATE OF MISSISSIPPI TOBACCO LITIGATION:*

*THE PARTNERSHIP FOR A HEALTHY MISSISSIPPI, INTERVENOR*

*v.*

*STATE OF MISSISSIPPI, BY AND THROUGH GOVERNOR HALEY BARBOUR, THE MISSISSIPPI DIVISION OF MEDICAID IN THE OFFICE OF THE GOVERNOR, AND THE MISSISSIPPI HEALTH CARE TRUST FUND*

| | |
|---|---|
| DATE OF JUDGMENT: | 05/30/2006 |
| TRIAL JUDGE: | HON. JAYE A. BRADLEY |
| COURT FROM WHICH APPEALED: | JACKSON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | JAMES W. CRAIG |
| | FRED L. BANKS, JR. |
| | JAMES W. SHELSON |
| | ROBERT GREGG MAYER |
| | OFFICE OF THE ATTORNEY GENERAL |
| | BY: MARY JO WOODS |
| |     HAROLD E. PIZZETTA, III |
| ATTORNEYS FOR APPELLEES: | JOHN G. CORLEW |
| | VIRGINIA T. MUNFORD |
| | JAMES H. HEIDELBERG |
| | STEPHEN WALKER BURROW |
| | BRADLEY S. CLANTON |
| | JOAN LEIGH LUCAS |
| NATURE OF THE CASE: | CIVIL - STATE BOARDS AND AGENCIES |
| DISPOSITION: | ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND RENDERED - 06/14/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**CARLSON, JUSTICE, FOR THE COURT:**

¶1.     On May 30, 2006, the Jackson County Chancery Court entered an order vacating its previously-entered order of, December 22, 2000, which had allocated $20 million annually out of the tobacco settlement funds to the Partnership for a Healthy Mississippi. Additionally, the order of May 30, 2006, required that the payment made to the Partnership in January, 2006, be deposited into the Mississippi Health Care Trust Fund.  Aggrieved by the entry of the chancery court order of May 30, 2006, Attorney General Jim Hood, upon relation or information and on behalf of the State of Mississippi and the Partnership for a Healthy Mississippi, has appealed to us.  The Governor, Division of Medicaid, and Mississippi Health Care Trust Fund have cross-appealed, asserting that the chancellor erred in failing to transfer the remaining Partnership funds to the Health Care Trust Fund.  Finding the December 22, 2000, court-directed allocation of public monies to a private entity to have been an invalid and unenforceable order and thus void *ab initio*, we affirm the chancery court's May 30, 2006, order vacating its prior order, though for reasons different from those stated by the chancellor.  However, we find that the chancellor erred in failing to direct the Partnership for a Healthy Mississippi to relinquish all funds received from the prior, court-ordered diversion of public monies.  In the end, we affirm on direct appeal and reverse and render on cross-appeal.

2

## FACTS AND PROCEEDINGS IN THE TRIAL COURT

¶2. On May 23, 1994, the Attorney General for the State of Mississippi, Mike Moore, filed a civil action against the tobacco industry in the Chancery Court of Jackson County. The various tobacco companies specifically named in the original litigation as defendants included: The American Tobacco Company; American Brands, Inc.; R.J. Reynolds Tobacco Company; RJR Nabisco, Inc.; Batus Corporation; Brown & Williamson Tobacco Corporation; Philip Morris Companies, Inc.; Philip Morris Incorporated (Philip Morris U.S.A.); Liggett Group, Inc.; Liggett & Myers, Inc.; Brooke Group, Limited; Loews Corporation; Lorillard Corporation; The Council for Tobacco Research - U.S.A. Inc. (Successor to Tobacco Institute Research Committee); The Tobacco Institute, Inc.; Hill & Knowlton, Inc.; Corr-Williams Tobacco Company; Generic Products Corporation; Laurel Cigar & Tobacco Company, Inc.; Long Wholesale, Incorporated; The Lewis Bear Company; Wigley and Culp, Inc. of Gulfport, Mississippi; "A" Through "Z" Entities (Miss. R. Civ. P. 9(h) defendants) (the tobacco defendants). In the State's Complaint, the Attorney General alleged, *inter alia*,

> [T]he State [of Mississippi] has suffered harm and has incurred significant expenses associated with the provision of necessary health care and other such necessary assistance under various State programs to certain eligible citizens numbering in the thousands who suffer, or who have suffered, from tobacco-related injuries, diseases or sickness. This civil action is founded on principles of equity and is brought under Mississippi law to avoid a multiplicity of lawsuits in recovering such damages, and for such other relief as equitably may be obtained, for the harm thus unjustly, intentionally and wrongfully done and continuing to be done to the State and to its citizens by the various defendants, who have been and continue to be unjustly enriched thereby at the expense of the State.

3

In paragraph 40 of the Complaint, the State of Mississippi further alleged:

The State spends millions of dollars each year to provide or pay for health care and other necessary facilities and services on behalf of indigents and other eligible citizens whose said health care costs are directly caused by tobacco-induced cardiovascular disease, lung cancer, emphysema and other respiratory and other diseases.

Thus, the Complaint laid out four theories of recovery: restitution/unjust enrichment; indemnity; common law public nuisance; and injunctive relief.

¶3.     Under the first theory of recovery – restitution/unjust enrichment – the State of Mississippi stated in its Complaint:

In equity and fairness, it is the defendants, not the taxpayers of Mississippi, who should bear the costs of tobacco inflicted diseases. By avoiding their own duties to stand financially responsible for the harm done by their cigarettes, the defendants wrongfully have forced the State of Mississippi to perform such duties and to pay the health care costs of tobacco related disease. As a result, the defendants have been unjustly enriched to the extent that Mississippi's taxpayers have had to pay these costs.

¶4.     As to the second theory of recovery – indemnity – the State of Mississippi contended:

As a direct and proximate result of the breaches of duty and omissions of the defendants as alleged above, the State was obligated to pay and has paid millions of dollars in the past for the provision of necessary medical care, facilities and services for certain of those aforementioned Mississippi citizens injured by the defendants' cigarettes and unable to afford and otherwise obtain such necessary medical care, facilities and services.

¶5.     Concerning the third theory of recovery – common law public nuisance – the State of Mississippi alleged:

By their wrongful conduct as alleged above, the defendants have intentionally and unreasonably interfered with the public's right to be free from unwarranted injury, disease and sickness, and have caused damage to the public health, the public safety and the general welfare of the citizens of Mississippi, and have

4

thereby wrongfully caused the State to expend millions of dollars in support of the public health and welfare.

¶6. Therefore, under the first three theories of recovery, the State of Mississippi sought relief as follows:

    a.    for damages in an amount which is sufficient to provide restitution and re-pay the State for the sums the State has expended on account of the defendants' wrongful conduct, with said amount to be determined at trial;

    b.    for damages in restitution for the sums of money to be paid by the State in the future on account of the defendants' wrongful conduct;

    c.    for pre-judgment interest, as well as the State's reasonable attorneys' fees, expert witness fees and other costs of this action;

    d.    for punitive damages in such amount as will sufficiently punish the defendants for their conduct and as will serve as an example to prevent a repetition of such conduct in the future;

    e.    for such other and further extraordinary equitable, declaratory and/or injunctive relief as permitted by law as necessary to assure that the State has an effective remedy; and

    f.    for such other and further relief, as the Court deems just and proper, to which the State may be entitled.

¶7. Finally, under the fourth and last theory of recovery – injunctive relief – the State of Mississippi asked the chancery court for "a prohibitory injunction to be issued against the defendants to prohibit them from promoting the sale of their cigarettes to minors."

¶8. Thereafter, the chancery court set this cause for trial to begin on July 7, 1997. However, on July 2, 1997, the State of Mississippi, represented by the Attorney General, and the tobacco defendants, entered into a Memorandum of Understanding (MOU). On July 15,

5

1997, the MOU was approved by the chancery court, and this action resulted in a stay of the trial until such time as the parties were able to complete a final and comprehensive settlement agreement.

¶9.     On October 17, 1997, the State of Mississippi and the tobacco defendants executed a Comprehensive Settlement Agreement and Release (Settlement Agreement).[1]  The Settlement Agreement provided that an initial lump-sum payment of $170 million was to be paid into a special escrow account (Escrow Account) "for the benefit of the State of Mississippi."  Additionally, the Settlement Agreement contemplated that annual settlement payments were to be made to the State of Mississippi in perpetuity on December 31 of each year.  Thus, "paid into a special account for the benefit of the State of Mississippi" each year would be the following approximate amounts (in millions):

| Year: | 1998 | 1999 | 2000 | 2001 | 2002 | 2003 | Subsequent Years |
|---|---|---|---|---|---|---|---|
| Amount: | $68M | $76.5M | $85M | $110.5M | $110.5M | $136M | $136M |

These annual payments were likewise to be paid into the Escrow Account, subject to the provisions of the Settlement Agreement and a separate Escrow Agreement. The Settlement Agreement further provided that such payments made to the State of Mississippi by the various tobacco defendants "shall be adjusted upward by the greater of 3% or the Consumer Price Index applied each year on the previous year, beginning with the first annual payment."

---

[1]The terms of the Settlement Agreement which this Court provides in this opinion relate solely to the State of Mississippi.  The terms of the national settlement, or the various settlements with the other states involved in similar litigation, need not be discussed.

¶10.    Along with the initial lump-sum and installment payments, the Settlement Agreement provided for a two-year pilot program "aimed specifically at the reduction of the use of Tobacco Products by children under the age of 18 years." The pilot program was to be funded by a separate, lump-sum payment by the various tobacco companies in the amount of $61.8 million for the benefit of the State of Mississippi. The Settlement Agreement further established that the pilot program "shall last for a 24-month period;" that the $61.8 million "shall be used only . . . for general enforcement, media and other programs directed to the underage users or potential underage users of Tobacco Products;" and, that "[n]o expenditure from the Pilot Program Amount shall be made except upon application to the [chancery c]ourt by the Attorney General and approval of such application by the [chancery c]ourt."

¶11.    Furthermore, the Settlement Agreement stipulated that "[t]he monies received under this Settlement Agreement constitute reimbursement for *public health expenditures* made by the State of Mississippi. . . ." (Emphasis added). Thus, the funds were to be "*used for health-related expenses of the State of Mississippi.*" (Emphasis added). Finally, the Settlement Agreement mandated that "[t]his Settlement Agreement may be amended only by a writing executed by all signatories hereto, . . . ."

¶12.    On December 29, 1997, the Chancery Court of Jackson County approved the Settlement Agreement, concluding that "the terms of the [Settlement] Agreement are just and in the best interests of the State of Mississippi." The chancery court likewise retained jurisdiction to enforce the Settlement Agreement and the terms of the escrow agreements.

7

¶13.　On February 6, 1998, the Jackson County Chancery Court entered an agreed order directing the transfer of the initial, lump-sum payment of $170 million from the escrow agent, South Trust Bank, N.A., "to the State of Mississippi." On the same day, the chancery court, on the motion of the Attorney General, entered a separate order directing South Trust Bank, N.A., as escrow agent, to take appropriate action to assure that the funds "be deposited in the State Treasury into a special fund and invested as a lump-sum by the State Treasurer . . . until such time as appropriated or transferred by the State Legislature."[2]

¶14.　On June 3, 1998, the Partnership For A Healthy Mississippi (Partnership),[3] a private, non-profit entity, was created by the filing of the Articles of Incorporation in the Mississippi Secretary of State's office. Two days later, on June 5, 1998, the chancery court entered a Judgment and Order Approving the Mississippi Tobacco Pilot Program. The order establishing the pilot program provided that "the non-profit corporation 'The Partnership For A Healthy Mississippi' is to serve as the mechanism for administration of the Pilot Program." The Partnership forthwith received the sum of $61,818,000 from the tobacco defendants.

---

[2]While the chancery court does not have authority to direct the state legislature in appropriating state funds, in today's case, we are convinced that the chancellor was only attempting to protect the Settlement Agreement by placing the settlement funds into a special fund so as to allow the State Treasurer to invest the monies in an interest-bearing account until the Legislature allocated the funds. Additionally, we see no need for determining whether the chancellor had authority to earmark state money for health-related expenses because the Legislature subsequently enacted the Health Care Trust Fund. *See* Miss. Code Ann. §§ 43-13-401 through 43-13-409 (Rev. 2004).

[3]Unless otherwise specified, the phrase "The Partnership" is meant to include all the appellants, namely, the Attorney General, ex rel., State of Mississippi Tobacco Litigation, and the intervenor, the Partnership.

¶15.	On March 30, 1999, the state Legislature created the Mississippi Health Care Trust Fund (MHCTF)[4] in the State Treasury.  *See* Miss. Code Ann. §§ 43-13-401 through 43-13-409 (Rev. 2004).  Section 43-13-401 provided that the "funds received by the State of Mississippi from tobacco companies . . . should be applied toward improving the health and health care of the citizens and residents of the state.  It is the intent of the legislature by this article to provide the manner and means necessary to carry out those purposes."  Miss. Code Ann. § 43-13-401 (Rev. 2004).  Section 43-13-405(1) directed that $280 million "of the funds received by the State of Mississippi as a result of the tobacco settlement" be deposited into the Health Care Trust Fund; as well as, "all tobacco settlement installment payments made in subsequent years for which the use or purpose for expenditure is not restricted by the terms of the settlement . . . ."[5]  Furthermore, section 43-13-405(2) provides that:

> The Health Care Trust Fund shall remain inviolate and shall never be expended, except as provided in this article.  The ***Legislature shall appropriate*** from the Health Care Trust Fund such sums as are necessary to recoup any funds lost as a result of any of the following actions:
>
>> (a) The federal Centers for Medicare and Medicaid Services, or other agency of the federal government, is successful in

---

[4]When being discussed as an intervenor, the Mississippi Health Care Trust Fund will be referred to as "MHCTF."  When being referred to as a depository, the Mississippi Health Care Trust Fund will be referred to as the "Health Care Trust Fund."

[5]The difference between the $280 million mentioned in the statute, and the $170 million mentioned in the Settlement Agreement was due to the settlement of similar litigation in a sister state, which settlement occurred subsequent to the execution of Mississippi's Settlement Agreement. This upward adjustment was envisioned in the express language of the Settlement Agreement, and the statute. *See* Miss. Code Ann. § 43-13-403(d) (Rev. 2004).

recouping tobacco settlement funds from the State of Mississippi;

(b) The federal share of funds for the support of the Mississippi Medicaid Program is reduced directly or indirectly as a result of the tobacco settlement;

(c) Federal funding for any other program is reduced as a result of the tobacco settlement; or

(d) Tobacco cessation programs are mandated by the federal government or court order.

Miss. Code Ann. § 43-13-405(2)(a)-(d)(Rev. 2004) (emphasis added).[6]

¶16. From March 30, 1998, until December 22, 2000, all of the State's proceeds from the tobacco settlement installment payments were deposited into the Health Care Trust Fund.[7] However, on December 22, 2000, the chancery court entered an order directing, *inter alia*, that $20 million per year was to be taken from the annual tobacco settlement payments and deposited into the Partnership account. Specifically, the order stated that:

[s]uch payments shall be in the amount of twenty-million dollars each year taken from the settlement payments due from the tobacco companies beginning with the December 31, 2000 and January 2, 2001 payments and each year thereafter. Settling defendants are hereby ordered to pay their pro-rata share of twenty-million dollars to an account, established at Hancock Bank entitled The Partnership for a Healthy Mississippi, Inc., a Mississippi non-profit

---

[6]Although Section 43-13-405(3) provided that this section would be repealed on July 1, 2004, a 2004 legislative amendment changed the repealer provision to July 1, 2006, and a 2006 legislative amendment extended the date of the repealer to July 1, 2010.

[7]According to the formula set out, *supra*, approximately $229.5 million was deposited into the Health Care Trust Fund between March 30, 1998, and December 22, 2000, as a result of the tobacco settlement payments.

10

corporation, account #010628174, in the same manner as they pay the regularly scheduled payments due and owing the State of Mississippi.

¶17. This order further provided that "[t]he remainder of the settlement payments due after twenty-million dollars has been paid to the Partnership shall be transferred by wire to the account previously designated by the State of Mississippi for this purpose as has been done in prior years." Finally, the chancery court's order of December 22, 2000, also stated that "[t]he Court will continue to monitor the progress of the Partnership and retains jurisdiction for any and all matters concerning both the Partnership's activities and the settlement agreement. . . ."[8]

¶18. On November 6, 2003, the Joint Committee on Performance Evaluation and Expenditure Review of the Mississippi Legislature (PEER Committee)[9] issued a report entitled "A Review of the Legality of the Chancery Court Order Directing Annual Payments of Twenty Million Dollars in Perpetuity to the Partnership for a Healthy Mississippi."

---

[8]Similar orders were entered by the chancery court on January 17, 2002; November 20, 2003; and December 21, 2004. However, unlike the December 22, 2000, order, the subsequent orders characterized the $20 million annual payment to the Partnership as being paid "by the defendant tobacco companies" as opposed to "taken from the settlement payments due from the tobacco companies." However, the Partnership continued to receive $20 million annually from the State of Mississippi's annual tobacco settlement installment payments.

[9]The PEER Committee was created by the Legislature to "provide . . . a variety of services to the Legislature, including program evaluations, economy and efficiency reviews, financial audits, limited scope evaluations, fiscal notes, special investigations, briefings to individual legislators, testimony, and other governmental research and assistance." The PEER Committee is comprised of "five members of the House of Representatives appointed by the Speaker and five members of the Senate appointed by the Lieutenant Governor."

11

¶19. After reviewing the legality of the chancery court order of December 22, 2000, the PEER Committee concluded that this order was "not in compliance with state law." Additionally, the PEER Committee concluded that the chancery court "lacked the statutory and constitutional power to direct that twenty million dollars that should be paid to the Health Care Trust Fund be deposited annually, in perpetuity, to the credit of the Partnership for a Healthy Mississippi." More specifically, the PEER Committee stated, "[i]t is a well-understood principle in Mississippi constitutional law that the Legislature appropriates funds and that this power is exclusive to the Legislature." Based on this conclusion, the PEER Committee recommended that the Attorney General "seek dissolution of the December 2000 chancery court order that directed annual payments of $20 million to the Partnership for a Healthy Mississippi."

¶20. Notwithstanding the PEER Committee's recommendation issued only two weeks earlier, the Partnership, on November 20, 2003, filed with the chancery court the Partnership's annual report for 2002 and requested that the chancery court enter an order approving the annual report and the continued $20 million annual payment to the Partnership from the tobacco settlement installment payments. On the same day, the chancery court, without notice or a hearing, entered an "Order Approving the Report of the Mississippi Tobacco Pilot Program." The record does not reveal whether, prior to the entry of this order, the chancery court was ever informed by the Partnership, or anyone else, of the existence of the PEER Committee report dated November 6, 2003. If the chancellor had been presented a copy of this PEER Committee report, the chancellor would have known by this time that

12

the executive branch, through the Attorney General, and the legislative branch were no longer in agreement as to the chancery court order entered on December 22, 2000.[10]

¶21. On December 21, 2004, the Partnership filed another annual report with the chancery court, detailing the Partnership's activities from June 1, 2003 to May 31, 2004.[11] Once again, the chancery court entered an order approving the Partnership's annual report.

¶22. By this time, Senator Mike Chaney, approximately one month prior to the entry of the order of December 21, 2004, had written a letter to General Hood on November 18, 2004, expressing concerns about the court-ordered diversion of $20 million each year to the Partnership. On January 27, 2005, Haley Barbour, Governor of the State of Mississippi,[12] sent a memorandum to General Hood seeking authority to hire outside counsel to pursue vacation of the order of December 22, 2000, "[s]ince [the Attorney General's] office will not be representing us in this litigation." Shortly thereafter, on February 1, 2005, State Treasurer Tate Reeves submitted a letter to General Hood requesting that the Attorney General's office represent the "Board of the Health Care Trust Fund" in order to recover "any monies that are

---

[10]The absence of agreement between the executive and legislative branches of government was a basis used by the chancellor to later vacate the order entered on December 22, 2000.

[11]In 2003, General Moore did not seek re-election, and on November 4, 2003, Jim Hood was elected to serve as Attorney General. General Hood took office in January, 2004, and was thus automatically substituted in General Moore's stead in these proceedings. Therefore, starting in 2004, General Hood is listed as the Attorney General in all relevant documentation.

[12]Governor Barbour was elected on November 4, 2003, and was administered the oath of office as Governor in January 2004.

13

due and owing the Health Care Trust Fund." Senator Chaney and Treasurer Reeves received no relief from the Attorney General's office concerning their requests, but Governor Barbour received conditional authority from General Hood to hire outside counsel at the rate of $150 per hour "for the sole purpose of filing a motion to establish standing to intervene before Chancery Judge Jaye Bradley in the Chancery Court of Jackson County, Mississippi in cause number 94-1429 . . . assum[ing] that you have the funds in your budget for which you are authorized to expend legal fees in this matter."

¶23. On February 10, 2005, Governor Barbour, and the Mississippi Division of Medicaid, the Office of the Governor, filed a motion to intervene. Additionally, the Governor and Division of Medicaid filed a Motion to Set Aside and Vacate the chancery court order of December 22, 2000. Less than one month later, on March 7, 2005, the Partnership filed its Motion to Intervene. Finally, on March 31, 2005, MHCTF filed its Motions to Intervene and to Vacate and Incorporated Memorandum of Law.

¶24. On April 1, 2005, Attorney General Jim Hood filed a response to the motion to intervene filed by the Governor and Division of Medicaid. That same day, the Governor and Division of Medicaid responded to the Rule 12(b)(6) motion to dismiss filed by the Partnership. *See* Miss. R. Civ. P. 12(b)(6). Also, the Governor and Division of Medicaid responded to the Partnership's motion to intervene.

¶25. On April 12, 2005, based on General Hood's response to the motion to intervene filed by the Governor and Division of Medicaid, the Governor and Division of Medicaid filed a Rebuttal Memorandum in Support of the Motion to Intervene.

14

¶26. On April 19, 2005, the Partnership requested that its response to MHCTF's motion to intervene be stayed until such time as the chancery court determined if the Partnership could intervene. Additionally, the Governor and Division of Medicaid filed a rebuttal to the issue of whether the Partnership had a right to intervene pursuant to Miss. R. Civ. P. 24(a)(2).

¶27. On April 20, 2005, MHCTF opposed the Partnership's motion for a stay. Thereafter, on May 23, 2005, General Hood filed a response to MHCTF's motion to intervene. Finally, MHCTF replied to General Hood's opposition to MHCTF's motion to intervene.

¶28. Before such motions to intervene could be decided, on May 24, 2005, the Attorney General made an *ore tenus* motion for a continuance so that the state Legislature could have an opportunity to review the chancery court order of December 22, 2000. Subsequent to the Attorney General's *ore tenus* motion, the Governor made an *ore tenus* motion to stay the transfer of funds to the Partnership and expenditures by the Partnership in 2005. On June 21, 2005, the chancery court granted the Attorney General's *ore tenus* motion for a continuance, but denied the Governor's *ore tenus* motion to stay transfer of funds to the Partnership and expenditures by the Partnership.

¶29. On August 5, 2005, we entered an Order granting the Petition for Permission to Appeal and for Extraordinary Relief and Request for Expedited Appeal filed by the Governor and Division of Medicaid. This Court further found that the "Jackson County Chancery County erred in granting the continuance until some undetermined time in 2006." We likewise stated that "[t]he question of staying transfers of money to the Partnership or

15

expenditures by the Partnership will not be considered here because it is ultimately dependant on the merits of this case."

¶30. On November 2, 2005, the Governor and Division of Medicaid filed in the chancery court a Memorandum in Support of their Motion to Intervene. On November 16, 2005, MHCTF filed its Rebuttal to the Partnership's Response to MHCTF's Motion to Intervene.

¶31. On December 1, 2005, the Jackson County Chancery Court conducted a hearing on the motions to intervene filed by the Governor and Division of Medicaid, MHCTF and the Partnership. All three motions to intervene were granted on December 16, 2005. In addition, the chancery court ordered the Partnership to hold the "2005 installment payment in trust, allowing no expenditure, budgeting or other use of said installment until a full hearing and final judgment is entered."

¶32. Thereafter, on December 19, 2005, the Governor and Division of Medicaid filed a Rule 60 motion to set aside the chancery court order of December 22, 2000. *See* Miss. R. Civ. P. 60. Ten days later, on December 29, 2005, MHCTF filed a Motion to Vacate and Incorporated Memorandum of Law asking the chancery court to set aside its orders of December 22, 2000; January 17, 2002; November 20, 2003; and December 21, 2004. These orders had directed the annual payments of $20 million from the State of Mississippi's tobacco settlement installment payments to the Partnership.

¶33. On April 12, 2006, the Partnership filed its Response in Opposition to the Motion to Vacate and Incorporated Memorandum of Law. On April 17, 2006, General Hood filed a Response in Opposition to the Motions to Vacate and Incorporated Memorandum of Law.

16

¶34.   Based on the objections of the Partnership and the Attorney General, MHCTF, on April 20, 2006, filed a Rebuttal to the Opposition of its Motion to Vacate which had been filed by the Partnership.  On May 2, 2006, MHCTF filed a Rebuttal to the Opposition of its Motion to Vacate which had been filed by the Attorney General.  On April 21, 2006, the Governor and Division of Medicaid filed a Rebuttal Memorandum in Support of Motion to Vacate.

¶35.   Then, on April 24, 2006, General Hood served a Supplemental Response in Opposition to the Motion to Vacate and Incorporated Memorandum of Law.  Not surprisingly, the Governor and Division of Medicaid filed a Rebuttal to Supplemental Response of the Attorney General on April 25, 2006.  The motion to vacate was heard on April 25, 2006, and all parties were present.  At the conclusion of this evidentiary hearing, the chancellor took this matter under advisement for subsequent ruling.

¶36.   On May 30, 2006, the Jackson County Chancery Court entered a detailed order which is the subject of this appeal.  In the course of our discussion of the issues, we will set out verbatim *infra* the contents of this order, which is unquestionably relevant to today's issues. Suffice it to state here, for the sake of brevity, that in this May 30, 2006, order, the chancellor found that since there was agreement between the legislative and executive branches at the time of the entry of the order of December 22, 2000, to divert to the Partnership account at Hancock Bank the sum of $20 million each year from the tobacco settlement funds being paid on an annual basis, the chancery court had authority to enter the order of December 22, 2000; but, that since there was no longer an agreement between these two branches of state

17

government concerning the annual funding of the Partnership, the court no longer had authority to fund the Partnership via an annual court order. The chancellor thus vacated the earlier order of December 22, 2000.

¶37. On June 2, 2006, the Partnership filed its appeal to this Court, asserting that this Court should: (1) vacate the chancellor's May 30 order which had vacated the chancery court order of December 22, 2000; and, (2) vacate the chancery court order of December 16, 2005, granting leave to intervene to the Governor, Division of Medicaid and MHCTF. On June 13, 2006, the Governor, on behalf of the State of Mississippi, Division of Medicaid and MHCTF, filed a Notice of Cross Appeal asserting: (1) that the chancery court order of May 30, 2006, should have required the Partnership to transfer to the Health Care Trust Fund all unexpended funds received pursuant to the chancery order of December 22, 2000; and, (2) that on May 24, 2005, the chancery court should have granted a stay of all expenditures of the Partnership pending determination of the validity of the order of December 22, 2000.

¶38. The Partnership filed a Motion to Stay Pending Appeal on June 21, 2006. On June 29, 2006, the Partnership amended its Notice of Appeal to include the State of Mississippi. The Governor, Division of Medicaid and MHCTF responded to the Partnership's Notice of Appeal on June 30, 2006. Along with their response, the Governor, Division of Medicaid and MHCTF filed a Motion to Stay Pending Appeal and an Amended Notice of Cross-Appeal.

¶39. Thereafter, on July 26, 2006, the Partnership filed a Response to the Motion for Stay Pending Appeal and a Rebuttal in Support of its own Motion for Stay Pending Appeal filed

18

by the Governor, Division of Medicaid and MHCTF. The Partnership's motions persuaded the Governor, Division of Medicaid and MHCTF to file a Rebuttal Motion in Support of their Motion for Stay Pending Appeal.

¶40. On August 30, 2006, General Hood filed a Notice of Joinder to Motion for Stay Pending Appeal. On September 12, 2006, the chancery court denied all motions for stay pending appeal. Following the chancery court's denial of the motion to stay, the Governor, Division of Medicaid and MHCTF filed a motion to stay with this Court.

¶41. Thus, this Court likewise has been called upon to consider certain preliminary issues in this case, as revealed by certain actions taken by the Court. On October 4, 2006, a three-justice-panel order was entered expediting the appeal and referring the matter for en banc consideration. On October 19, 2006, an en banc order was entered granting the Motion for Stay Pending Appeal filed by the Governor, Division of Medicaid and MHCTF. Such order further directed that the Partnership "shall not expend any funds, that it currently holds and which it received pursuant to the State of Mississippi's tobacco settlement payments."

## DISCUSSION

### I. WHETHER THE GOVERNOR, DIVISION OF MEDICAID, AND THE MISSISSIPPI HEALTH CARE TRUST FUND HAVE THE RIGHT TO INTERVENE AND CHALLENGE THE CHANCERY COURT ORDER OF DECEMBER 22, 2000.

¶42. The Partnership first asserts that the Chancery Court of Jackson County erred by allowing the Governor, Division of Medicaid, and MHCTF to intervene and challenge the December 22, 2000, order allocating $20 million annually to the Partnership. Specifically,

19

the Partnership contends that the Governor, Division of Medicaid and MHCTF: (1) cannot intervene in a concluded matter; (2) have no statutory authority to intervene in this particular matter; and (3) lack legal authority to intervene. However, the Partnership's main argument focuses on whether the motion to intervene was timely as provided by Miss. R. Civ. P. 24.

¶43.   We first note that considerable discretion is given to a trial court in ruling on a motion to intervene. *Hayes v. Leflore County Bd. of Supervisors*, 935 So. 2d 1015, 1017 (Miss. 2006) (citing *City of Tupelo v. Martin*, 747 So. 2d 822, 826 (Miss. 1999); *Cummings v. Benderman*, 681 So. 2d 97, 101 (Miss. 1996); *Guaranty Nat'l Ins. Co. v. Pittman*, 501 So. 2d 377, 381 n. 1 (Miss. 1987)). That being said, a chancellor's *denial* of a motion to intervene is understandably reviewed under an abuse of discretion standard. *Hayes*, 935 So. 2d at 1017 (citing *Cohen v. Cohen*, 748 So. 2d 91, 93 (Miss. 1999)); *Perry County v. Ferguson*, 618 So. 2d 1270, 1271-72 (Miss. 1993). It necessarily follows that a chancellor's *grant* of a motion to intervene must be considered under the same standard of review as a chancellor's *denial* of a motion to intervene – abuse of discretion. *See e.g.*, *Monsanto v. Hall*, 912 So. 2d 134, 136 (Miss. 2005) (standard of review concerning trial court's grant or denial of motion for summary judgment is the same – de novo) (citing *Hataway v. Nicholls*, 893 So. 2d 1054, 1057 (Miss. 2005); *Miller v. Meeks*, 762 So. 2d 302, 304 (Miss. 2000)). *See also* *Pre-Paid Legal Serv., Inc. v. Battle*, 873 So. 2d 79, 82 (Miss. 2004) (standard of review concerning trial court's grant or denial of motion to compel arbitration is the same – de novo) (citing *Tupelo Auto Sales, Ltd. v. Scott*, 844 So. 2d 1167, 1169 (Miss. 2003)).

**A. Concluded Matter**

20

¶44. The Partnership takes the position that the Governor, Division of Medicaid and MHCTF cannot intervene to challenge the chancery court order of December 22, 2000, because intervention is not a means to relitigate concluded matters. In addition, the Partnership contends that allowing intervention may possibly jeopardize the Settlement Agreement between the State of Mississippi and the various tobacco defendants.

¶45. However, it is readily apparent that the Governor, Division of Medicaid and MHCTF are not attempting to relitigate issues already decided. The chancery court order of December 22, 2000, has never been litigated. While it is true that the Governor, Division of Medicaid and MHCTF could not now seek to vacate the Settlement Agreement entered into between the State of Mississippi and the various tobacco companies, they are not asking us to take the action of vacating the Settlement Agreement. In fact, the Governor, Division of Medicaid and MHCTF desire that the original Settlement Agreement be enforced according to its terms. What the Governor, Division of Medicaid and MHCTF are asking us to do is to uphold the chancery court's decision to vacate that court's order of December 22, 2000. Therefore, based on what the Governor, Division of Medicaid and MHCTF are requesting by way of relief from this Court, if such relief be granted, the Settlement Agreement would not be jeopardized, but actually enforced.

¶46. While the Partnership cites various Fifth Circuit decisions to support its proposition, reliance on such cases is misplaced. For instance, the Partnership cites *Cisneros v. Corpus Christi Independent School District*, 560 F.2d 190, 191 (5th Cir. 1977), for the proposition that a motion to intervene should be denied where a third party is seeking to relitigate matters

21

that already have been decided. In *Cisneros*, the Fifth Circuit concluded that the petitioners had no statutory right to intervene pursuant to Fed. R. Civ. P. 24(a)(1) and that the district court did not abuse its discretion in denying intervention under Fed. R. Civ. P. 24(a)(2) because the petitioners' interests were "adequately represented by existing parties."[13] *Id.* However, in today's case, the Partnership cannot assert that the interests of the Governor, Division of Medicaid and MHCTF are adequately protected. In fact, the Attorney General denied the request of the Governor, Division of Medicaid and MHCTF to challenge the chancery court order of December 22, 2000.

¶47. Accordingly, since the Governor, Division of Medicaid and MHCTF were not seeking to intervene in a concluded matter which had already been litigated, the Partnership's assertion lacks merit. By allowing intervention, the payments made by the tobacco companies each year would not be altered; and therefore, the Settlement Agreement would not be jeopardized.

¶48. We also feel compelled to address the dissent, wherein it is stated that "[t]he intervenors seek to participate in a case over four years after it was *finalized*." (Emphasis added). First of all, as we have noted, this case was not "finalized" at the time of intervention. The Governor was seeking a cessation of future, $20 million disbursements to the

---

[13]The provisions of Miss. R. Civ. P. 24(a)(2) and Fed. R. Civ. P. 24(a)(2) are virtually identical; therefore, federal judicial decisions offer guidance. *See Hartford Cas. Ins. Co. v. Halliburton Co.*, 826 So. 2d 1206, 1215 (Miss. 2001) (federal interpretation of Federal Rules of Civil Procedure is persuasive authority when interpreting the Mississippi Rules of Civil Procedure).

Partnership; the Governor was not seeking to reach back and recoup the annual $20 million disbursements already made as approved by the chancellor. Secondly, we emphasize that the Partnership was likewise not a party, but instead, an intervenor, just as were the Governor, Division of Medicaid and MHCTF. In fact, although close in time, it appears that the Governor was actually allowed to intervene before the Partnership.

### B. Statutory and Legal Authority

¶49. Next, the Partnership asserts that the Governor, Division of Medicaid and MHCTF have no statutory or legal authority to intervene. As to the Governor, the Partnership contends that Miss. Code Ann. § 7-1-5(n) (Rev. 2002) does not authorize the Governor to intervene.[14] However, we see no reason to address section 7-1-5(n) because it is abundantly clear that section 7-1-5(a) and (c) confirm the Governor's power to intervene. Section 7-1-5(a) states "He [the Governor] is the supreme executive officer of the state"; and section 7-1-5(c) further provides "He [the Governor] shall see that the laws are faithfully executed." These exact principles are also set out in article 5, sections 116, 123, of the Mississippi Constitution (1890).[15] Therefore, the Governor unquestionably has not only the statutory,

---

[14]Section 7-1-5(n) provides:
In addition to the powers conferred and duties imposed on the governor by the constitution and by the laws as elsewhere provided, he shall have the powers and perform the duties following, viz: . . . (n) He may bring any proper suit affecting the general public interests, in his own name for the state of Mississippi, if after first requesting the proper officer so to do, the said officer shall refuse or neglect to do the same.

[15]Art. 5, § 116, Miss. Const. (1890) provides, *inter alia*, that "[t]he chief executive power of this State shall be vested in a Governor . . ." Art. 5, § 123, Miss. Const. (1890),

23

but also the constitutional authority to intervene. In fact, the Governor is under a solemn duty to act in order to assure faithful execution of our laws.

¶50. Next, the Partnership contends that the Division of Medicaid does not have authority to intervene. In particular, the Partnership cites *Frazier v. State By and Through Pittman*, 504 So. 2d 675, 692 n. 16 (Miss. 1987), for the proposition "all state agencies are still duty bound to follow any statutory regulations concerning that agency's ability to bring a lawsuit." The Partnership thus asserts that unless the statute gives the agency the power to sue, the agency does not have the power to sue. The Partnership likewise states that while the Division of Medicaid does have authority to bring suit under Miss. Code Ann. § 43-13-121(1)(I) (Rev. 2004), this authority does not include matters regarding MHCTF. Essentially, the Partnership contends MHCTF is "outside the scope" of the Division of Medicaid's statutory authority.

¶51. However, the Division of Medicaid does have a compelling interest to see that the annual payments of $20 million are placed in the Health Care Trust Fund. In fact, back in 1994, the Attorney General initially brought suit for the express purpose of recouping monies expended by the State of Mississippi through the Division of Medicaid "in caring for their fellow citizens who have and are suffering from lung cancer; cardiovascular disease; emphysema; chronic obstructive pulmonary disease; and a variety of other cancers and diseases that were and are caused by cigarettes." Inasmuch as the state of Mississippi is now

---

states that "[t]he Governor shall see that the laws are faithfully executed."

24

recovering such tobacco funds as a result of monies spent by the Division of Medicaid, we find somewhat disingenuous the Partnership's argument that the Division of Medicaid has no authority to intervene because MHCTF is purportedly beyond the scope of the Division of Medicaid's statutory authority. Therefore, we hold that the Division of Medicaid had authority to intervene, especially, since the theory and purpose of the litigation was to replace money appropriated to and expended by the Division of Medicaid.

¶52. Lastly, the Partnership argues that MHCTF does not have proper authority to intervene. The Partnership again asserts that MHCTF must be authorized by statute to file suit. The Partnership insists that Miss. Code Ann. § 43-13-409(6) (Rev. 2004), which enumerates MHCTF's powers, does not grant MHCTF authority to sue. Section 43-13-409(6) provides, *inter alia*, that MHCTF

> shall have such powers as necessary or convenient to carry out the purposes and provisions of this article, including, but not limited to, the following express powers: (a) To contract for necessary goods and services, to employ necessary personnel, and to engage the services of consultants for administrative and technical assistance in carrying out its duties and responsibilities in administering the Health Care Trust Fund and the Health Care Expendable Fund.

This is no doubt a broad grant of statutory authority that ultimately gives MHCTF the power to sue. MHCTF asserts that the funds diverted to the Partnership rightfully belong to MHCTF, and that section 43-13-406(6) thus authorizes MHCTF to sue to recoup such funds.

¶53. While it is true that the Attorney General "is indeed the attorney for the State to represent the people's interest[,]" . . . [i]f an Attorney General declines to file a suit referred to him by a state agency, where the matter is of serious concern to state government, then that

25

agency . . . is at least entitled to have some court pass upon whether it should have its full day in court." ***Frazier***, 504 So. 2d at 691. Thus, "[t]he Attorney General's refusal to represent the agency does not deprive the court of the authority to keep jurisdiction and entertain the suit." ***Id***. However, if the suit is outside the official concern of the agency, the court unquestionably has the authority to dismiss the suit. The Governor, Division of Medicaid and MHCTF all have previously referred today's case to the Attorney General, who declined to take action; and the chancery court determined that the suit was within the official concern of the Governor, Division of Medicaid and MHCTF. Therefore, the chancery court was correct in its interpretation of ***Frazier***, and the motion to intervene cannot be set aside for a perceived lack of statutory or legal authority.

### C. Timeliness

¶54. Finally, the Partnership's main argument is that the Governor, Division of Medicaid and MHCTF should not have been permitted to intervene because their intervention was untimely. Miss. R. Civ. P. 24 governs intervention. Specifically at issue today is Miss. R. Civ. P. 24(a) – intervention of right. Miss. R. Civ. P. 24(a)(2) states:

> Upon timely application, anyone shall be permitted to intervene in an action . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

¶55. Thus, Miss. R. Civ. P. 24(a)(2) sets forth certain prerequisites for intervention, to wit: (1) timely application; (2) an interest in the subject matter of the action; (3) an applicant who

26

is so situated that disposition of the action may as a practical matter impair or impede his ability to protect his interest; and (4) an applicant's interest is not already adequately represented by existing parties. Miss. R. Civ. P. 24(a)(2); *see **Guar. Nat'l Ins. Co. v. Pittman***, 501 So. 2d 377, 381 (Miss. 1987). Once a would-be intervenor meets these requirements, the rule mandates that the would-be intervenor must be allowed to intervene.

¶56. The Partnership's main objection stems from the first prerequisite: timely application. On February 10, 2005, the Governor and Division of Medicaid filed their motion to intervene in the Jackson County Chancery Court. Soon thereafter, on March 31, 2005, MHCTF filed its motion to intervene. Thus, such motions were filed more than four years after the Jackson County Chancery Court's entry of its order of December 22, 2000. Despite the delay, the chancery court permitted the Governor, Division of Medicaid and MHCTF to intervene and declared their motions timely.

¶57. While timeliness is not defined in Miss. R. Civ. P. 24, the United States Court of Appeals for the Fifth Circuit offers guidance.[16] The Fifth Circuit has identified four factors

---

[16]Again, we reiterate that "Rule 24 of the Federal Rules of Civil Procedure and Rule 24 of the Mississippi Rules of Civil Procedure use virtually the same language to describe the requirements for intervention of right and permissive intervention. Both Rules also require the same intervention procedure." ***Federated Mut. Ins. Co. v. McNeal***, 943 So. 2d 658, 662 n. 6 (Miss. 2006). Therefore, it is useful for this Court to look to the federal judiciary for guidance in construing our rules. Additionally, "it is appropriate to look at federal law interpreting the federal rules since the Mississippi Rules of Civil Procedure were patterned after the Federal Rules of Civil Procedure." ***Owens v. Thomae***, 759 So. 2d 1117, 1121 n. 2 (Miss. 1999). *See also **Bourn v. Tomlinson Interest, Inc.***, 456 So. 2d 747, 749 (Miss. 1984).

which must be considered when determining whether a motion to intervene was timely filed.

These four factors are:

> (1) The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene;

> (2) The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case;

> (3) The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and,

> (4) The existence of unusual circumstances militating either for or against a determination that the application is timely.

*Stallworth v. Monsanto Co.*, 558 F.2d 257, 264-66 (5th Cir. 1977). *See also*, *Hodges, Grant & Kaufmann v. U.S.*, 762 F.2d 1299, 1302-03 (5th Cir. 1985); *Walker v. Jim Dandy Co.*, 747 F.2d 1360, 1365 (11th Cir. 1984). We also cited *Stallworth* in *Pittman*, 501 So. 2d at 381-82. Thus, "timeliness is not limited to chronological considerations, but 'is to be determined from all the circumstances.'" *Stallworth*, 558 F.2d at 263 (citing *U.S. v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir. 1975) (quoting *NAACP v. N.Y.*, 413 U.S. 345, 366, 93 S. Ct. 2591, 2603, 37 L. Ed. 2d 648, 662 (1973)). While none of the factors is outcome-determinative, satisfying one in some instances may be enough.

¶58.    We now individually consider and apply the timeliness factors to the facts of today's case. The first timeliness factor to consider is "the length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before

28

he petitioned for leave to intervene." ***Stallworth,*** 558 F.2d at 264; ***Pittman***, 501 So. 2d at 382.  The language is clear that "actual knowledge is not required."  ***Id.*** at 264 (citing ***NAACP***, 413 U.S. at 366).

¶59.   The record reflects, and the chancery court determined, that the Governor, Division of Medicaid and MHCTF were aware of the order.  Specifically, the chancellor concluded the application for intervention was timely "due to the current, ongoing and future expenditures and income from tobacco settlement monies."  In addition, the chancellor retained jurisdiction under subsequent orders.  We agree with the chancery court.  We do not look at the entry of the December 22, 2000, order in a vacuum.  Since settlement monies were received on an annual basis by the Partnership, the State was continuing to suffer a loss each year because the payment of $20 million was disbursed, not to the state treasury, but to a private entity, namely the Partnership.

¶60.   The second factor to consider when determining timeliness under Rule 24 is the "extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case." ***Stallworth***, 558 F.2d at 265; ***Pittman***, 501 So. 2d at 382.  When considering prejudice in the context of timeliness, the only prejudice that is relevant is "that prejudice which would result from the would-be intervenor's failure to request intervention as soon as he knew or reasonably should have known about his interest in the action." ***Stallworth***, 558 F.2d at 265.  In addition, "it is apparent that prejudice to the existing parties other than that caused by the would-be

29

intervenor's failure to act promptly [is] not a factor meant to be considered where intervention [is] sought under section (a)." *Id*. Thus, this Court cannot take into account any and all prejudice that the existing parties are likely to incur if intervention is permitted. *Id.* Such prejudice is measured at the time the motion to intervene is filed. ***Pittman***, 501 So. 2d at 382.

¶61. In its order entered on December 16, 2005, the chancery court found:

> [N]o prejudice will befall the parties to the tobacco litigation. The tobacco companies' required payments to the State of Mississippi, in accordance with the terms of the settlement, will not be affected by the outcome of the pending motions. The State of Mississippi will not be prejudiced because it will continue to receive the required payments.

We wholeheartedly agree with the chancellor. In this particular instance, a distinction needs to be drawn between the State of Mississippi, represented by the Attorney General, and the Partnership. The Partnership was **not** an original party to the tobacco settlement. The Partnership was permitted to intervene at approximately the same time as the Governor, Division of Medicaid and MHCTF. Thus, the chancery court was eminently correct when it determined that the original parties to the tobacco litigation will not suffer prejudice by the intervention of the Governor, Division of Medicaid and MHCTF. In this same order of December 16, 2005, the chancellor also stated, *inter alia*, that "[t]here is no opposition from the Governor or the Trust Fund to the intervention of the Partnership into this action, contingent upon their motions being granted. Therefore, the Partnership shall be allowed to intervene into this action as well."

30

¶62. The third factor to consider is the "extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied." *Stallworth*, 558 F.2d at 265-66; *Pittman*, 501 So. 2d at 382. The prejudice that would result if the Governor, Division of Medicaid and MHCTF are not allowed to intervene is great. Essentially, $20 million which arguably could only be properly and legally appropriated by the Legislature would continue to be diverted to the Partnership. Since the Partnership is a private, non-profit entity, it is controlled by a private board of directors and is not subject to the safeguards otherwise afforded public funds. The Partnership's expenditures are not subject to regulation by the State Department of Audit or by public purchasing laws. The Partnership purportedly receives and spends state funds without any public accountability or oversight. Therefore, we hold that the chancery court was correct when it stated, "[t]o deny intervention would deny the Governor and Trust Fund of their arguable and purported right to input regarding expenditures or budgeting of these funds."

¶63. Finally, the fourth consideration under timeliness is the "existence of unusual circumstances militating either for or against a determination that the application is timely." *Stallworth*, 558 F.2d at 266; *Pittman*, 501 So. 2d at 382. In this context, the chancery court stated, "[t]he question of constitutionality of the Order should be resolved to avoid any further litigation over this matter." Although the Partnership argues there should not have been any further litigation after the Settlement Agreement to begin with, we find this assertion to be without merit. The Attorney General, in December 2000, petitioned the chancery court *ex parte* to "modify" the settlement agreement. Because this modification

31

may have been in violation of the applicable statutes and the Settlement Agreement, we find the existence of unusual circumstances militating for a determination that the application is timely.

¶64.    The dissent correctly sets out the four-part test to be applied in determining whether an application for intervention is timely; however, the dissent, after discussing the first timeliness factor, "fast-forwards" past the remaining factors and conclusively opines: "Accordingly, in certain extreme cases when the motion to intervene has been filed may be dispositive of the entire analysis. This is one of those cases. Four years is simply too long to satisfy the requirements of Rule 24." In all deference to the dissent, we refuse to abandon the four-part timeliness test already discussed, and we are firmly convinced that our thorough analysis of all four of the "timeliness" factors leads us to the inescapable conclusion we reach today concerning the timeliness issue.

¶65.    Since "[t]he question whether an application for intervention is timely is largely committed to the discretion of the trial court, and its determination will not be overturned on appeal unless an abuse of discretion is shown[,]" the Partnership's assertion lacks merit and the chancery court's decision must stand. *Stallworth*, 558 F.2d at 263 (citing *NAACP v. N.Y.*, 413 U.S. at 367; *U.S. v. U.S. Steel Corp.*, 548 F.2d 1232, 1235 (5th Cir. 1977); *McDonald v. E. J. Lavino Co.,* 430 F.2d 1065, 1071 (5th Cir. 1971)). Stated differently, when considering the facts and circumstances peculiar to this particular case as revealed by the record before us, we are constrained to find as a matter of well-established law that the

chancellor did not abuse her discretion in finding that the application for intervention by the Governor, Division of Medicaid and MHCTF was timely.

> **II. WHETHER THE CHANCERY COURT ORDER OF DECEMBER 22, 2000, ALLOCATING $20 MILLION A YEAR TO THE PARTNERSHIP IS A VALID AND ENFORCEABLE ORDER.**

¶66. The Partnership asserts that even if the Governor, Division of Medicaid and MHCTF had the right to intervene, the chancery court order of December 22, 2000, was a valid and enforceable modification to the original Settlement Agreement and should not have been vacated by the chancery court. On the other hand, the Governor, Division of Medicaid and MHCTF claim that the order of December, 2000, violated the Mississippi Constitution, the Mississippi Health Care Trust Fund statutes, court rules and procedures, and the Settlement Agreement.

¶67. We thus turn to the chancery court order of May 30, 2006, which vacated the earlier order of December 22, 2000. In this order of May 30, 2006, the chancellor stated:

> At the time this Court's Order was entered on December 22, 2000, there was agreement between the Legislative and Executive branches of government, as represented by the Attorney General, for entry of said Order in an effort to protect this portion of the tobacco settlement funds.

> The testimony presented demonstrated that the State of Mississippi, by and through the Attorney General of the State of Mississippi, procured the order in question after presenting the Court with the Order and further indicating, as the chief legal officer for the State of Mississippi that all parties, the state of Mississippi and tobacco companies, were in agreement. Since entry of the order in question and until the filing of the Motion to Intervene, the Executive and Legislative branches of government, as evidenced by the testimony regarding the agreement of legislative leaders and individual members of the legislature, the increase in budgets and spending ability of government

33

agencies directly related to funding by the Partnership, and both legislative action and inaction, have been in agreement with said order. It is clear that this no longer exist (sic) and that the Executive and Legislative branches of government no longer agree to the Order in question.

Absent agreement between those specific branches of government or specific legislation authorizing funding of the Partnership, this Court is placed in the position of determining the allocation and expenditure of disputed funds from the tobacco settlement.

The Court finds this is outside the scope of this Court's authority and falls within the province of the legislative branch of government. The legislation recently passed by the Mississippi Legislature which directed funding of the Partnership is further evidence that this is a legislative function, subject to the veto power of the Executive as was exercised in regard to the recent legislation.

Absent agreement among the Legislative and Executive branches of government for the State of Mississippi and absent specific legislation providing for the creation and funding of a tobacco cessation program, the Court looks to the language of the settlement agreement. The settlement agreement only provides for the funding of a 24 month "pilot" program.

. . .

While this Court recognizes the efforts and the success of the Partnership as evidenced through the testimony and pleadings, and recognizes the effort of the State of Mississippi, through its Attorney General, to procure these settlement proceeds from various tobacco companies, this Court cannot legislate. Without agreement between the Executive and Legislative branches of state government of the State of Mississippi or specific legislation authorizing funding of the Partnership, this Court is now without authority to continue funding of the Partnership pursuant to the terms of the Order now challenged.

¶68. We disagree with the "absent agreement" rationale applied by the chancellor to undergird her decision to vacate the previously entered order of December 22, 2000.

However, while we agree with the chancellor's vacating the order, we do so for reasons different from those stated by the chancellor, and we will explain why.

¶69. Again, we must remember who are the original parties to this action – the Attorney General, for and on behalf of the citizens of this State, and the various tobacco defendants. These parties voluntarily entered into a Settlement Agreement which was approved by the chancery court. However, the Partnership was not a party at the time of the settlement because it did not even exist. In fact, in today's case, the Partnership stands in the same shoes as the Governor, Division of Medicaid and MHCTF – an intervenor. We must also keep in mind that, as a matter of practicality, we are dealing with a contract which was entered into on October 17, 1997, by the State of Mississippi and the tobacco defendants, when they executed the Settlement Agreement, which was later approved by the Jackson County Chancery Court by order entered on December 29, 1997. This Settlement Agreement, approved by the chancery court, provided, *inter alia*, that (1) $170,000,000 initially would be paid into the State Treasury; and (2) an additional $61,818,000 would be paid for a 24-month pilot program focusing on the reduction of tobacco use by our state's youth. In June 1998, the duly-created, private, non-profit Partnership properly received the $61.8 million for the twenty-four-month pilot program. The Settlement Agreement also provided for various sums thereafter to be paid annually by the tobacco companies into the State Treasury. It was for the receipt of these subsequent annual payments from the tobacco defendants that the Legislature in 1999 statutorily created the Mississippi Health Care Trust Fund within the State Treasury. For the sake of emphasis, we set out *in toto* the declaration

35

of legislative intent at the time of the establishment of the Health Care Trust Fund. Miss.

Code Ann. § 43-13-401 (Rev. 2004) states:

> It is declared by the Legislature that the funds received by the State of Mississippi from tobacco companies in settlement of a certain lawsuit brought against those companies by the State of Mississippi, or as a result of the settlement of any lawsuit brought against the tobacco companies by another state, should be applied toward improving the health and health care of the citizens and residents of the state. It is the intent of the Legislature by this article to provide the manner and means necessary to carry out those purposes.

When this statutory expression of legislative intent is read in conjunction with the Settlement

Agreement and the chancery court order approving the Settlement Agreement, we cannot

envision a declaration of legislative intent which could be any clearer than that which is set

out in section 43-13-401.

¶70.    Notwithstanding this clear expression of legislative intent, the Partnership contends

that the Mississippi Health Care Trust Fund Act authorizes the continued funding of the

Partnership with settlement proceeds. The Partnership asserts that Miss. Code Ann. § 43-13-

405 illustrates that MHCTF should not receive all of the tobacco funds. Section 43-13-

405(1), as cited by the Partnership, states:

> In accordance with the purposes of this article, there is established in the State Treasury the Health Care Trust Fund, into which shall be deposited Two Hundred Eighty Million Dollars ($280,000,000.00) of the funds received by the State of Mississippi as a result of the tobacco settlement as of the end of fiscal year 1999, *and all tobacco settlement installment payments made in subsequent years for which the use or purpose for expenditure is not restricted by the terms of the settlement. . . .*

(Emphasis added).

36

¶71.   Furthermore, the Partnership points to section 43-13-405(2)(d) to show that the Legislature contemplated that a portion of the tobacco funds was to be used for a tobacco cessation program.  Section 43-13-405(2)(d) states in relevant part:

> The Health Care Trust Fund shall remain inviolate and shall never be expended, except as provided in this article.  The Legislature shall appropriate from the Heath Care Trust Fund such sums as are necessary to recoup any funds lost as a result of any of the following actions:

> (d) Tobacco cessation programs are mandated by the federal government or court order.

¶72.   However, the Partnership's reliance on the Health Care Trust Fund Statutes is misplaced.  A plain reading of section 43-13-405(1) states that *all* of the tobacco installment payments were to be made to the Health Care Trust Fund unless restricted by the terms of the Settlement Agreement.  The Settlement Agreement never restricted $20 million of the tobacco installment payments for the program which is currently run by the Partnership.  In fact, the granting of $20 million to the Partnership each year explicitly contradicts the Settlement Agreement, which directs that the annual installment payments are to be paid *into a special account for the benefit of the State of Mississippi*. (Emphasis added).  In addition, according to the very terms of the Settlement Agreement, the pilot program was set to "last for a 24-month period."  The continued funding of the initial pilot program through the Partnership occurred only after an *ex parte* proceeding attended by the chancellor and the then-Attorney General.

¶73.   With regard to section 43-13-405(2)(d), the language of the statute is also clear that the *"legislature shall appropriate from the Health Care Trust Fund such sums as are*

37

necessary to recoup any funds lost as a result of any of the following actions: (d) Tobacco cessation programs which are mandated by the federal government or court order." (Emphasis added). The statute does not grant *any court* authority to allocate such funds. The statute expressly states that the funds must come from the Health Care Trust Fund, not directly from the tobacco installment payments, and that the funds must be appropriated by the Legislature. Neither prerequisite is met by the chancery court's order of December 22, 2000.

¶74.   Additionally, the chancellor stated in her opinion:

> The Partnership contends that Section 43-13-405 (2) MCA, shows legislative authorization for the Court to order a tobacco cessation program. However, this provision does not specifically provide for the creation of that program or its funding. A reading of the relevant statutes anticipates implementation of a national tobacco cessation program, which was contemplated during settlement of the tobacco litigation involving various states who were parties to those lawsuits.

We agree with the chancellor inasmuch as section 43-13-405(2)(d) does not give the chancery court authority to legislate or to continue funding the Partnership pursuant to the terms of the order of December 22, 2000.

¶75.   Although we are not deciding today's case on constitutional grounds, we do acknowledge that the Governor, Division of Medicaid and MHCTF attack the constitutionality of the chancery court order of December 22, 2000. The assertion is that the chancery court order of December 22, 2000, violates article 1, sections 1-2, of the Mississippi constitution, which deals with the separation of powers doctrine. Section 1 of our state constitution provides "[t]he powers of the government of the State of Mississippi shall be

38

divided into three distinct departments, and each of them confided to a separate magistracy, to-wit: those which are legislative to one, those which are judicial to another, and those which are executive to another." Section 2 of our state constitution states, *inter alia*, "[n]o person or collection of persons, being one or belonging to one of these departments, shall exercise any power properly belonging to either of the others."

¶76.   However since the constitutionality issue is not outcome-determinative in today's case, we need not discuss the issue of whether the chancery court order of December 22, 2000 is constitutional.  This Court has steadfastly adhered to the rule that we will abstain from ruling on a constitutional issue unless such determination is necessary to a disposition of the case.  *Freeman v. PERS*, 822 So. 2d 274, 281 (Miss. 2002); *Dean v. PERS*, 797 So. 2d 830, 833 (Miss. 2000); *Johnson v. Memorial Hosp.*, 732 So. 2d 864, 866 (Miss. 1998); *Scott v. Flynt*, 704 So. 2d 998, 1007 (Miss. 1996); *Kron v. Van Cleave*, 339 So. 2d 559, 563 (Miss. 1976) ("It is familiar learning that courts will not decide a constitutional question unless it is necessary to do so in order to decide the case.")

¶77.   With this being said, we note the obvious.  The Legislature holds the purse strings.  To illustrate this point, we have previously stated:

> Under all constitutional governments recognizing three distinct and independent magistracies, the control of the purse strings of government is a legislative function; indeed, it is the supreme legislative prerogative, indispensable to the independence and integrity of the legislature, and not to be surrendered or abridged, save by the constitution itself, without disturbing the balance of the system and endangering the liberties of the people.  The right of the legislature to control the public treasury, to determine the sources from which the public revenues shall be derived and the objects upon which they shall be expended, to dictate the time, the manner, and the means both of

39

their collection and disbursement is firmly and inexpugnably established in our political system.

*City of Belmont v. Miss. State Tax Comm'n*, 860 So. 2d 289, 306-07 (Miss. 2003) (citing *Colbert v. State*, 86 Miss. 769, 775, 39 So. 65, 66 (1905)).

¶78.   More recently, in *Myers v. City of McComb*, 943 So. 2d 1 (Miss. 2006), we reiterated the importance of the separation of powers doctrine outlined in the Mississippi Constitution. In our discussion of the separation of powers doctrine we stated, "Article 1, Section 2 of the Mississippi Constitution prohibits the exercise of "*any power*" belonging to one branch by a member of another branch." *Id*. at 4 (emphasis in original).   Thus, it follows that the judicial branch cannot perform a clearly legislative branch function.  The prevailing power of the Legislature stems from the power of the purse.  In *Myers,* we again enunciated, "'the legislative department alone has access to the pockets of the people, and has in some Constitutions full discretion, and in all, a prevailing influence over the pecuniary rewards of those who fill the other departments, a dependence is thus created in the latter, which gives still greater facility to encroachments of the former.'"  *Id.* at 8 (citing The Federalist No. 48 at 334 (James Madison)).

¶79.   Before money can come out of the state treasury, such money must be appropriated by the Legislature.  *State ex rel. Barron v. Cole*, 81 Miss. 174, 193, 32 So. 314, 315 (1902) ("[n]o money can come into the treasury or go out of it lawfully except as directed by legislative act.  Collection and disbursement of public money belong to the legislature and must be done as it directs."). Without question, the expenditure of public funds is

appropriately a legislative function. ***Bd. of Supervisors v. Bailey***, 236 So. 2d 420, 423 (Miss. 1970) ("The appropriation of public funds is traditionally within the exclusive province of the legislature.") The $20 million given annually to the Partnership has never been appropriated. Instead, the chancery court entered the December, 2000, order on an *ex parte* motion by the Attorney General. However, the chancery court is not authorized by law to make such a modification. The tobacco installment payments are monies that unquestionably belong to the state of Mississippi, and all of these payments, including the annual payments which were diverted to the Partnership, should have been placed in the Health Care Trust Fund until properly appropriated by the Legislature.

¶80.    However, the Partnership asserts that the funds paid to the Partnership are not subject to the appropriations process. To support its argument, the Partnership contends that the tobacco settlement payments are private funds given for a designated purpose; and thus, are not "state funds." The Partnership relies on ***Tatum v. Wheeless***, 180 Miss. 800, 178 So. 95 (1938), for the assertion that non-state funds given to the state of Mississippi for a designated purpose are not subject to the appropriations process. ***Tatum*** involved Mississippi's unemployment compensation law. In ***Tatum***, the Legislature levied taxes on employers and required the funds to be placed into a trust fund for the benefit of persons who involuntarily lost their jobs. The Legislature did take affirmative action and we correctly held "[a]s this money is not property to be put into the state treasury, but is to be held by the state treasurer, who is authorized to place it in the depositories, and keep it apart and separate from the general funds of the state. . . ." ***Tatum***, 180 Miss. at 827-28, 178 So. at 102.

41

¶81. We find that ***Tatum*** is clearly distinguishable. In the case *sub judice*, the Legislature did not take affirmative action to set aside $20 million each year specifically for the Partnership. Instead, the provisions of the Settlement Agreement set aside $61.8 million for a two-year pilot program for which the Partnership was thereafter established to control. Nowhere in the Settlement Agreement did the State of Mississippi or the various tobacco defendants address continued funding for the pilot program. The chancellor acknowledged this reality in her May 30, 2006, order which vacated the December 22, 2000, order, when she found, *inter alia*, that "absent specific legislation providing for the creation and funding of a tobacco cessation program, the Court looks to the language of the settlement agreement."

¶82. Turning now to the Settlement Agreement, it is clear that while the Settlement Agreement provided for subsequent amendments; it is equally clear that such amendments were to be in writing and signed by the signatories to the Settlement Agreement. The December 22, 2000, order which diverted $20 million annually to the Partnership, was generated without a written motion and from an *ex parte* meeting by the Attorney General with the chancellor. Thus, the Settlement Agreement was improperly "amended" by the *ex parte* entry of the December 22, 2000, order, without a written amendment signed by the signatories to the original Settlement Agreement.

¶83. Likewise, the Settlement Agreement provides only for the funding of a twenty-four month 'pilot' program."

¶84. In fact, the language of the Settlement Agreement states in pertinent part:

8. <u>Pilot Program Payment</u>. In support of the State of Mississippi's demonstrated commitment to the meaningful and immediate reduction of the use of Tobacco Products by children under the age of 18 years, Settling Defendants agree to support a pilot program (the "Mississippi Tobacco Pilot Program"), the terms of which shall be submitted to the Court by the Attorney General of the State of Mississippi, and the elements of which shall be aimed specifically at the reduction of the use of Tobacco Products by children under the age of 18 years. Accordingly, on or before October 20, 1997, Settling Defendants shall, pursuant to a mutually acceptable escrow agreement attached hereto as Exhibit A, cause to be paid into a second special escrow account (the "Mississippi Tobacco Pilot Program Escrow Account"), for the benefit of the State of Mississippi, to be held in escrow pending Final Approval of this Settlement Agreement, the sum of $61,818,000. *The Mississippi Tobacco Pilot Program shall commence within a reasonable period after Final Approval of this Settlement Agreement, and shall last for a 24-month period.* The $61,818,000 amount payable by Settling Defendants in support of the Mississippi Tobacco Pilot Program (the "Pilot Program Amount") shall be used only after Court approval of the specific terms of the Mississippi Tobacco Pilot Program for general enforcement, media, educational and other programs directed to the underage users or potential underage users of Tobacco Products, but shall not be directed against any particular tobacco company or companies or any particular brand of Tobacco Products. No expenditure from the Pilot Program Amount shall be made except upon application to the Court by the Attorney General and approval of such application by the Court.

(Emphasis added). The Settlement Agreement goes on to state:

9. <u>Annual Payments</u>. Each of the Settling Defendants agrees, severally and not jointly, that on December 31, 1998 and annually thereafter (subject to final adjustment within 30 days), it shall cause to be paid *into a special account for the benefit of the State of Mississippi* (the "Account"). . . .

(Emphasis added). Given that the annual payments were to be deposited into "a special account for the benefit of the State of Mississippi," it is the Legislature's solemn duty and responsibility to appropriate these funds and not that of the judiciary. It is important to note that funds held in a "special account" still equate to "state money." Additionally, it is abundantly clear from the unconditional language of the Settlement Agreement that by its

43

very terms, the pilot program was to last for only twenty-four months, at which time the pilot program was to expire by the express terms of the Settlement Agreement.

¶85.    In the end, we are constrained to find that the chancery court order of December 22, 2000, must be vacated since it was void *ab initio* because of being in violation of the applicable statutes and the Settlement Agreement; therefore, we need not delve any further into such issues as whether the December 22, 2000, order violates the Mississippi Constitution and court rules and procedures. Thus, while the chancery court was incorrect in its reasoning, we here uphold the chancellor's order of May 30, 2006, which order vacated the prior order of December 22, 2000, albeit for reasons different from those stated by the chancellor.  This Court has constantly held that if a trial court reaches the right decision, we will affirm that decision even though the trial court may have reached that right decision for the wrong reason. *Aldridge v. West*, 929 So. 2d 298, 303 (Miss. 2006); *Georgia-Pacific Corp., Inc. v. Mooney*, 909 So. 2d 1081, 1089 (Miss. 2005) (citing *Donald v. Amoco Production Co.*, 735 So. 2d 161, 177 (Miss. 1999)); *Falco Lime v. Mayor of Vicksburg*, 836 So. 2d 711, 725 (Miss. 2002) (citing *Jackson v. Fly*, 215 Miss. 303, 311, 60 So. 2d 782, 786 (1952)).  *See also* *Fulton v. Robinson Indus., Inc.*, 664 So. 2d 170, 176 (Miss. 1995). Accordingly, we affirm the May 30, 2006, order insofar as it vacates the prior chancery court order of December 22, 2000.  However, there is one more issue which we must address.

44

### III. WHETHER THE FUNDS CURRENTLY HELD BY THE PARTNERSHIP FOR A HEALTHY MISSISSIPPI MUST BE TRANSFERRED TO THE MISSISSIPPI HEALTH CARE TRUST FUND

¶86. Having determined (1) that the Governor, Division of Medicaid and MHCTF had a right to intervene in this action for the purpose of challenging the chancery court order of December 22, 2000; and, (2) that the chancery court order of December 22, 2000, allocating $20 million per year to the Partnership, was not a valid and enforceable order (in other words, that the order was void *ab initio*), we now turn to the final issue of whether the funds currently held by the Partnership as a result of the December 22, 2000, order must be transferred to the Health Care Trust Fund. This issue is raised on cross-appeal by the Governor, Division of Medicaid and MHCTF.[17]

¶87. Reiterating our finding in Issue II, *supra*, that the order of December 22, 2000, was void *ab initio*, we point out that, simply stated, the phrase "void *ab initio*" means that "[a] contract is null from the beginning if it seriously offends law or public policy in contrast to a contract which is merely voidable at the election of one of the parties to the contract." Black's Law Dictionary 1411 (5th ed. 1979). In **Samples v. Davis**, 904 So. 2d 1061 (Miss. 2004), we stated:

> In **Guilford County v. Eller**, 146 N.C. App. 579, 553 S.E.2d 235 (2001), the North Carolina Court of Appeals was faced with a similar issue of whether it

---

[17]The Governor, Division of Medicaid and MHCTF do not raise the issue of reimbursement for the Partnership's expenditure of funds which were received by the Partnership via previous chancery court orders. Thus, we need not address this issue which has not been raised on appeal.

was error for the trial court to sign and enter a written judgment not consented to by all parties. In its opinion, the court stated:

> A consent judgment is a contract of the parties entered upon the records of a court of competent jurisdiction with its sanction and approval. It is well-settled that "'the power of the court to sign a consent judgment depends upon the unqualified consent of the parties thereto; and *the judgment is void if such consent does not exist at the time the court sanctions or approves the agreement and promulgates it as a judgment.'" "[A] consent judgment is void if a party withdraws consent before the judgment is entered*." If a consent judgment is set aside, it must be set aside in its entirety. The person who challenges the validity of a consent judgment, bears the burden of proof to show that it is invalid.

*Id.* at 581, 553 S.E.2d at 236 (citations omitted) (emphasis added). *Samples*, 904 So. 2d at 1064.

¶88. This Court has consistently stated that a consent judgment is in the nature of a contract. *Parker v. Parker*, 434 So. 2d 1361, 1362 (Miss. 1983); *Guthrie v. Guthrie*, 233 Miss. 550, 553, 102 So. 2d 381, 383 (1958). The 1997 Settlement Agreement and the chancellor's subsequent "consent judgment" approving the Settlement Agreement were in fact a contract between the Attorney General, for and on behalf of Mississippi's citizens, and the tobacco companies.

¶89. Any effort to amend the 1997 consent judgment would have to comport with the provisions of the Settlement Agreement. Clearly, the December 22, 2000, *ex parte* order was contrary to the express provisions of the 1997 Settlement Agreement and the subsequent court order approving the Settlement Agreement; therefore, the December 22, 2000, order was void *ab initio*. Because the December 22, 2000, order was void *ab initio*, it necessarily

46

follows that the subsequently-entered orders of January 17, 2002, November 20, 2003, and December 21, 2004, were likewise void and that, therefore, the Partnership has no right to the monies received under these orders; therefore, the chancellor erred in failing to direct the Partnership to pay over all remaining funds derived from the December 22, 2000, order to the Health Care Trust Fund and subsequent orders. *See Mellott v. Love, Supt. of Banks*, 152 Miss. 860, 865-66, 119 So. 913 (1929) (when contract is void *ab initio*, parties are "restored to the status in which they would have been if the contract had never been made").

**CONCLUSION**

¶90.    For the reasons stated, the order of May 30, 2006, as entered by the Jackson County Chancery Court, is affirmed in part, and reversed in part and rendered. We find that while the chancellor properly permitted the Partnership, Governor, Division of Medicaid and MHCTF to intervene, and while the chancellor properly vacated the previously-entered order of December 22, 2000, the chancellor erred in failing to declare the December 22, 2000, order to be void *ab initio*, and in failing to direct the Partnership to relinquish all funds currently held by the Partnership (funds derived from the December 22, 2000, order, and the subsequently-entered orders) by transferring these funds to the Mississippi Health Care Trust Fund.

¶91.    Consistent with this opinion, the Partnership for a Healthy Mississippi shall forthwith transfer to the Health Care Trust Fund all funds derived from the chancery court orders of

December 22, 2000, January 17, 2002, November 20, 2003, and December 21, 2004, as well as any other chancery court order which otherwise diverted any of the tobacco settlement funds into the Partnership account, contrary to the judicially approved Settlement Agreement.

¶92.   **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: REVERSED AND RENDERED.**

**SMITH, C.J., WALLER, P.J., EASLEY, DICKINSON AND RANDOLPH, JJ., CONCUR.   DIAZ, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION. GRAVES AND LAMAR, JJ., NOT PARTICIPATING.**

**DIAZ, PRESIDING JUSTICE, DISSENTING:**

¶93.   Because today the majority disregards our Rules of Civil Procedure and established case law regarding timely intervention, I must respectfully dissent.

¶94.   The intervenors seek to participate in a case more than four years after it was finalized.  Intervention in Mississippi may be achieved pursuant to our M.R.C.P. 24, which allows intervention by right and permissive intervention; in both instances the motion shall be made "[u]pon timely application . . . ."  We have previously determined that "timeliness has no fixed meaning," and so we have considered four factors:

> (1) the length of time during which the would be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene;
> (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case;
> (3) the extent of any prejudice that the would be intervenor may suffer if his petition for leave to intervene is denied; and
> (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

48

*City of Tupelo v. Martin*, 747 So.2d 822, 826 (Miss. 1999) (internal citations and quotation omitted). Yet this four-factor analysis is still grounded upon the central concept of timeliness.

¶95. Two factors are explicitly concerned with timeliness, and the other two are intertwined with the results of timeliness or the lack thereof. Therefore, as a threshold matter, a motion must be timely. *See Martin*, at 826 ("Regardless of whether intervention of right or permissive intervention is sought, in either case the motion must be timely") (emphasis added).[18]

¶96. Accordingly, in certain extreme cases, when the motion to intervene has been filed may be dispositive of the entire analysis. This is one of those cases. Four years is simply too long to satisfy the requirements of Rule 24. Indeed, our Court of Appeals has held that when a party had notice of an action on April 14, a motion to intervene filed later that year on December 15 is not "timely" for the purposes of Rule 24. *See His Way, Inc. v. McMillin*, 909 So. 2d 738, 747-48 (Miss. Ct. App. 2005). While in *His Way* seven months constituted a "substantial delay" that warranted the denial of a motion to intervene, the majority today finds that nearly fifty months is somehow timely. *Id.* at 748.

¶97. Such a result would likely not be reached in other fora. *See Lioi v. Safturf Int'l Ltd.*, 2004 WL 2391985, *2 (Ohio App. 5 Dist. Oct. 25, 2004) (when party had notice of an

---

[18]The simpler variation of this test used in some courts is still grounded on the central concept of timeliness. *See United States v. Washington*, 86 F.3d 1499, 1503 (9th Cir.1996) (test for intervention is "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay").

action three years before filing a motion to intervene a "trial court would not abuse its discretion in denying [a party's] motion to intervene on the basis of this factor standing alone"); *Farrell v. Board of Com'rs, Lemhi County*, 64 P.3d 304, 316 (Idaho 2002) (denial of motion to intervene upheld when "three years had passed since the commencement of the suit"); *Williams v. Winston*, 640 N.E.2d 923, 925 (Ohio Com.Pl. 1994) (motion to intervene "must be timely made" and motion was untimely when case has "been pending for four years"); *Mohr v. State Bank of Stanley*, 770 P.2d 466, 473-75 (Kan. 1989) (motion to intervene denied as untimely when brought roughly four years after litigation began); *Apodaca v. Town of Tome Land Grant*, 520 P.2d 552, 553-54 (N.M. 1974) (denial of motion to intervene upheld when filed "four and one-half years after . . . litigation started" and where "[o]ther means [were] available to . . . protect and assert the[] rights" of the intervenors); *Armstrong v. Tidelands Life Ins. Co.*, 466 S.W.2d 407, 412 (Tex. Civ. App. 1971) (petition for intervention denied when submitted "three years and nine months after suit was filed").

¶98.     The ruling of the majority could allow the system of checks and balances in this State to be thrust into chaos, as no procedure or policy would ever become concrete. For no matter how much time has passed–whether four years or forty—under the majority's rule a successor in office may proceed to decimate the binding and legal contracts and arrangements of her predecessor. Such caprice should be avoided at all costs, and I am greatly concerned about the repercussions and ricochets we shall see from this decision.

¶99. Because today our Rules of Civil Procedure and longstanding precedent are subverted, and a noble effort to protect the lives of Mississippians is dismantled, I must respectfully dissent.