# SUMMA CORP. *v.* CALIFORNIA EX REL. STATE LANDS COMMISSION ET AL.

No. 82–708.  Argued February 29, 1984—Decided April 17, 1984

Rehnquist, J., delivered the opinion of the Court, in which all other Members joined except Marshall, J., who took no part in the decision of the case.

*Warren M. Christopher* argued the cause for petitioner. With him on the briefs were *Henry C. Thumann, Zoe E. Baird, William M. Bitting,* and *Steven W. Bacon.*

*Deputy Solicitor General Claiborne* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Assistant Attorney General Dinkins, Dirk D. Snel,* and *Richard J. Lazarus.*

*Nancy Alvarado Saggese,* Deputy Attorney General of California, argued the cause for respondents. With her on the brief for respondent State of California were *John K. Van De Kamp,* Attorney General, and *N. Gregory Taylor,* Assistant Attorney General. *Gary R. Netzer, Ira Reiner,* and *Norman L. Roberts* filed a brief for respondent City of Los Angeles.*

Justice Rehnquist delivered the opinion of the Court.

Petitioner owns the fee title to property known as the Ballona Lagoon, a narrow body of water connected to Marina del Rey, a manmade harbor located in a part of the city of

---

*\*Edgar B. Washburn* and *Nancy J. Stivers* filed a brief for the California Land Title Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the National Audubon Society et al. by *Palmer Brown Madden* and *Linda Agerter;* and for Amigos de Bolsa Chica by *Lynda Martyn.*

Briefs of *amici curiae* were filed for the State of Texas by *Jim Mattox,* Attorney General, *David R. Richards,* Executive Assistant Attorney General, and *Jim Mathews, R. Lambeth Townsend,* and *Ginny Agnew,* Assistant Attorneys General; and for the Pacific Legal Foundation by *Ronald A. Zumbrun* and *John H. Findley.*

Los Angeles called Venice. Venice is located on the Pacific Ocean between the Los Angeles International Airport and the city of Santa Monica. The present case arises from a lawsuit brought by respondent city of Los Angeles against petitioner Summa Corp. in state court, in which the city alleged that it held an easement in the Ballona Lagoon for commerce, navigation, and fishing, for the passage of fresh waters to the Venice Canals, and for water recreation. The State of California, joined as a defendant as required by state law, filed a cross-complaint alleging that it had acquired an interest in the lagoon for commerce, navigation, and fishing upon its admission to the Union, that it held this interest in trust for the public, and that it had granted this interest to the city of Los Angeles. The city's complaint indicated that it wanted to dredge the lagoon and make other improvements without having to exercise its power of eminent domain over petitioner's property. The trial court ruled in favor of respondents, finding that the lagoon was subject to the public trust easement claimed by the city and the State, who had the right to construct improvements in the lagoon without exercising the power of eminent domain or compensating the landowners. The Supreme Court of California affirmed the ruling of the trial court. *City of Los Angeles* v. *Venice Peninsula Properties*, 31 Cal. 3d 288, 644 P. 2d 792 (1982).

In the Supreme Court of California, petitioner asserted that the Ballona Lagoon had never been tideland, that even if it had been tideland, Mexican law imposed no servitude on the fee interest by reason of that fact, and that even if it were tideland and subject to a servitude under Mexican law, such a servitude was forfeited by the failure of the State to assert it in the federal patent proceedings. The Supreme Court of California ruled against petitioner on all three of these grounds. We granted certiorari, 460 U. S. 1036 (1983), and now reverse that judgment, holding that even if it is assumed that the Ballona Lagoon was part of tidelands subject by Mexican law to the servitude described by the Supreme

Court of California, the State's claim to such a servitude must have been presented in the federal patent proceeding in order to survive the issue of a fee patent.[1]

---

[1] Respondents argue that the decision below presents simply a question concerning an incident of title, which even though relating to a patent issued under a federal statute raises only a question of state law. They rely on cases such as *Hooker v. Los Angeles*, 188 U. S. 314 (1903), *Los Angeles Milling Co. v. Los Angeles*, 217 U. S. 217 (1910), and *Boquillas Land & Cattle Co. v. Curtis*, 213 U. S. 339 (1909). These cases all held, quite properly in our view, that questions of riparian water rights under patents issued under the 1851 Act did not raise a substantial federal question merely because the conflicting claims were based upon such patents. But the controversy in the present case, unlike those cases, turns on the proper construction of the Act of March 3, 1851. Were the rule otherwise, this Court's decision in *Barker v. Harvey*, 181 U. S. 481 (1901), would have been to dismiss the appeal, which was the course taken in *Hooker*, rather than to decide the case on the merits. See also *Beard v. Federy*, 3 Wall. 478 (1866). The opinion below clearly recognized as much, for the California Supreme Court wrote that "under the Act of 1851, the federal government succeeded to Mexico's right in the tidelands granted to defendants' predecessors upon annexation of California," 31 Cal. 3d, at 298, 644 P. 2d, at 798, an interest that "was acquired by California upon its admission to statehood," *id.*, at 302, 644 P. 2d, at 801. Thus, our jurisdiction is based on the need to determine whether the provisions of the 1851 Act operate to preclude California from now asserting its public trust easement.

The 1839 grant to the Machados and Talamantes contained a reservation that the grantees may enclose the property "without prejudice to the traversing roads and servitudes *[servidumbres]*." App. 5. According to expert testimony at trial, under Las Siete Partidas, the law in effect at the time of the Mexican grant, this reservation in the Machados' and Talamantes' grant was intended to preserve the rights of the public in the tidelands enclosed by the boundaries of the Rancho Ballona. The California Supreme Court reasoned that this interest was similar to the common-law public trust imposed on tidelands. Petitioner and *amicus* United States argue, however, that this reservation was never intended to create a public trust easement of the magnitude now asserted by California. At most this reservation was inserted in the Mexican grant simply to preserve existing roads and paths for use by the public. See *United States v. Coronado Beach Co.*, 255 U. S. 472, 485–486 (1921); *Barker v. Harvey, supra*; cf. *Jover v. Insular Government*, 221 U. S. 623 (1911). While it is beyond cavil that we may take a fresh look at what Mexican law may have been in

Petitioner's title to the lagoon, like all the land in Marina del Rey, dates back to 1839, when the Mexican Governor of California granted to Augustin and Ignacio Machado and Felipe and Tomas Talamantes a property known as the Rancho Ballona.[2] The land comprising the Rancho Ballona became part of the United States following the war between the United States and Mexico, which was formally ended by the Treaty of Guadalupe Hidalgo in 1848. 9 Stat. 922. Under the terms of the Treaty of Guadalupe Hidalgo the United States undertook to protect the property rights of Mexican landowners, Treaty of Guadalupe Hidalgo, Art. VIII, 9 Stat. 929, at the same time settlers were moving into California in large numbers to exploit the mineral wealth and other resources of the new territory. Mexican grants encompassed well over 10 million acres in California and included some of the best land suitable for development. H. R. Rep. No. 1, 33d Cong., 2d Sess., 4–5 (1854). As we wrote long ago:

---

1839, see *United States* v. *Perot*, 98 U. S. 428, 430 (1879); *Fremont* v. *United States*, 17 How. 542, 556 (1855), we find it unnecessary to determine whether Mexican law imposed such an expansive easement on grants of private property.

[2] The Rancho Ballona occupied an area of approximately 14,000 acres and included a tidelands area of about 2,000 acres within its boundaries. The present-day Ballona Lagoon is virtually all that remains of the former tidelands, with filling and development or natural conditions transforming most of much larger lagoon area into dry land. Although respondent Los Angeles claims that the present controversy involves only what remains of the old lagoon, a fair reading of California law suggests that the State's claimed public trust servitude can be extended over land no longer subject to the tides if the land was tidelands when California became a State. See *City of Long Beach* v. *Mansell*, 3 Cal. 3d 462, 476 P. 2d 423 (1970).

The Mexican grantees acquired title through a formal process that began with a petition to the Mexican Governor of California. Their petition was forwarded to the City Council of Los Angeles, whose committee on vacant lands approved the request. Formal vesting of title took place after the Rancho had been inspected, a Mexican judge had completed "walking the boundaries," App. 213, and the conveyance duly registered. See generally *id.*, at 1–13; *United States* v. *Pico*, 5 Wall. 536, 539 (1867).

> "The country was new, and rich in mineral wealth, and attracted settlers, whose industry and enterprise produced an unparalleled state of prosperity. The enhanced value given to the whole surface of the country by the discovery of gold, made it necessary to ascertain and settle all private land claims, so that the real estate belonging to individuals could be separated from the public domain." *Peralta* v. *United States*, 3 Wall. 434, 439 (1866).

See also *Botiller* v. *Dominguez*, 130 U. S. 238, 244 (1889).

To fulfill its obligations under the Treaty of Guadalupe Hidalgo and to provide for an orderly settlement of Mexican land claims, Congress passed the Act of March 3, 1851, setting up a comprehensive claims settlement procedure. Under the terms of the Act, a Board of Land Commissioners was established with the power to decide the rights of "each and every person claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government . . . ." Act of Mar. 3, 1851, § 8, ch. 41, 9 Stat. 632. The Board was to decide the validity of any claim according to "the laws, usages, and customs" of Mexico, § 11, while parties before the Board had the right to appeal to the District Court for a *de novo* determination of their rights, § 9; *Grisar* v. *McDowell*, 6 Wall. 363, 375 (1868), and to appeal to this Court, § 10. Claimants were required to present their claims within two years, however, or have their claims barred. § 13; see *Botiller* v. *Dominguez, supra.* The final decree of the Board, or any patent issued under the Act, was also a conclusive adjudication of the rights of the claimant as against the United States, but not against the interests of third parties with superior titles. § 15.

In 1852 the Machados and the Talamantes petitioned the Board for confirmation of their title under the Act. Following a hearing, the petition was granted by the Board, App. 21, and affirmed by the United States District Court on ap-

peal, *id.*, at 22–23. Before a patent could issue, however, a survey of the property had to be approved by the Surveyor General of California. The survey for this purpose was completed in 1858, and although it was approved by the Surveyor General of California, it was rejected upon submission to the General Land Office of the Department of the Interior. *Id.*, at 32–34.

In the confirmation proceedings that followed, the proposed survey was readvertised and interested parties informed of their right to participate in the proceedings.[3] The property owners immediately north of the Rancho Ballona protested the proposed survey of the Rancho Ballona; the Machados and Talamantes, the original grantees, filed affidavits in support of their claim. As a result of these submissions, as well as a consideration of the surveyor's field notes and underlying Mexican documents, the General Land Office withdrew its objection to the proposed ocean boundary. The Secretary of the Interior subsequently approved the survey and in 1873 a patent was issued confirming title in the Rancho Ballona to the original Mexican grantees. *Id.*, at 101–109. Significantly, the federal patent issued to the Machados and Talamantes made no mention of any public trust interest such as the one asserted by California in the present proceedings.

The public trust easement claimed by California in this lawsuit has been interpreted to apply to all lands which were

---

[3] It is plain that the State had the right to participate in the patent proceedings leading to confirmation of the Machados' and Talamantes' grant. The State asserts that as a "practice" it did not participate in confirmation proceedings under the 1851 Act. Brief for Respondent California 16, n. 17. In point of fact, however, the State and the city of Los Angeles participated in just such a proceeding involving a rancho near the Rancho Ballona. See *In re Sausal Redundo and Other Cases*, Brief for General Rosecrans and State of California et al., and Resolutions of City Council of Los Angeles, Dec. 24, 1868, found in National Archives, RG 49, California Land Claims, Docket 414. Moreover, before the Mexican grant was confirmed, Congress passed a statute specially conferring a right on all parties claiming an interest in any tract embraced by a published survey to file objections to the survey. Act of July 1, 1864, § 1, ch. 194, 13 Stat. 332.

tidelands at the time California became a State, irrespective of the present character of the land. See *City of Long Beach v. Mansell*, 3 Cal. 3d 462, 486–487, 476 P. 2d 423, 440–441 (1970). Through this easement, the State has an overriding power to enter upon the property and possess it, to make physical changes in the property, and to control how the property is used. See *Marks* v. *Whitney*, 6 Cal. 3d 251, 259–260, 491 P. 2d 374, 380–381 (1971); *People* v. *California Fish Co.*, 166 Cal. 576, 596–599, 138 P. 79, 87–89 (1913). Although the landowner retains legal title to the property, he controls little more than the naked fee, for any proposed private use remains subject to the right of the State or any member of the public to assert the State's public trust easement. See *Marks* v. *Whitney, supra.*

The question we face is whether a property interest so substantially in derogation of the fee interest patented to petitioner's predecessors can survive the patent proceedings conducted pursuant to the statute implementing the Treaty of Guadalupe Hidalgo. We think it cannot. The Federal Government, of course, cannot dispose of a right possessed by the State under the equal-footing doctrine of the United States Constitution. *Pollard's Lessee* v. *Hagan*, 3 How. 212 (1845). Thus, an ordinary federal patent purporting to convey tidelands located within a State to a private individual is invalid, since the United States holds such tidelands only in trust for the State. *Borax, Ltd.* v. *Los Angeles*, 296 U. S. 10, 15–16 (1935). But the Court in *Borax* recognized that a different result would follow if the private lands had been patented under the 1851 Act. *Id.*, at 19. Patents confirmed under the authority of the 1851 Act were issued "pursuant to the authority reserved to the United States to enable it to discharge its international duty with respect to land which, although tideland, had not passed to the State." *Id.*, at 21. See also *Oregon ex rel. State Land Board* v. *Corvallis Sand & Gravel Co.*, 429 U. S. 363, 375 (1977); *Knight* v. *United States Land Assn.*, 142 U. S. 161 (1891).

This fundamental distinction reflects an important aspect of the 1851 Act enacted by Congress. While the 1851 Act was intended to implement this country's obligations under the Treaty of Guadalupe Hidalgo, the 1851 Act also served an overriding purpose of providing repose to land titles that originated with Mexican grants. As the Court noted in *Peralta* v. *United States*, 3 Wall. 434 (1866), the territory in California was undergoing a period of rapid development and exploitation, primarily as a result of the finding of gold at Sutter's Mill in 1848. See generally J. Caughey, California 238–255 (2d ed. 1953). It was essential to determine which lands were private property and which lands were in the public domain in order that interested parties could determine what land was available from the Government. The 1851 Act was intended "to place the titles to land in California upon a stable foundation, and to give the parties who possess them an opportunity of placing them on the records of this country, in a manner and form that will prevent future controversy." *Fremont* v. *United States*, 17 How. 542, 553–554 (1855); accord, *Thompson* v. *Los Angeles Farming Co.*, 180 U. S. 72, 77 (1901).

California argues that since its public trust servitude is a sovereign right, the interest did not have to be reserved expressly on the federal patent to survive the confirmation proceedings.[4] Patents issued pursuant to the 1851 Act were,

---

[4] In support of this argument the State cites to *Montana* v. *United States*, 450 U. S. 544 (1981), and *Illinois Central R. Co.* v. *Illinois*, 146 U. S. 387 (1892), in support of its proposition that its public trust servitude survived the 1851 Act confirmation proceedings. While *Montana* v. *United States* and *Illinois Central R. Co.* v. *Illinois* support the proposition that alienation of the beds of navigable waters will not be lightly inferred, property underlying navigable waters can be conveyed in recognition of an "international duty." *Montana* v. *United States, supra*, at 552. Whether the Ballona Lagoon was navigable under federal law in 1850 is open to speculation. The trial court found only that the present-day lagoon was navigable, App. to Pet. for Cert. A–52, while respondent Los Angeles concedes that the lagoon was not navigable in 1850, Brief for Respondent Los Angeles 29. The obligation of the United States to respect

of course, confirmatory patents that did not expand the title of the original Mexican grantee. *Beard* v. *Federy*, 3 Wall. 478 (1866). But our decisions in a line of cases beginning with *Barker* v. *Harvey*, 181 U. S. 481 (1901), effectively dispose of California's claim that it did not have to assert its interest during the confirmation proceedings. In *Barker* the Court was presented with a claim brought on behalf of certain Mission Indians for a permanent right of occupancy on property derived from grants from Mexico. The Indians' claim to a right of occupancy was derived from a reservation placed on the original Mexican grants permitting the grantees to fence in the property without "interfering with the roads, crossroads and other usages." *Id.*, at 494, 495. The Court rejected the Indians' claim, holding:

> "If these Indians had any claims founded on the action of the Mexican government they abandoned them by not

the property rights of Mexican citizens was, of course, just such an international obligation, made express by the Treaty of Guadalupe Hidalgo and inherent in the law of nations, see *United States* v. *Moreno*, 1 Wall. 400, 404 (1864); *United States* v. *Fossatt*, 21 How. 445, 448 (1859).

The State also argues that the Court has previously recognized that sovereign interests need not be asserted during proceedings confirming private titles. The State's reliance on *New Orleans* v. *United States*, 10 Pet. 662 (1836), and *Eldridge* v. *Trezevant*, 160 U. S. 452 (1896), in support of its argument is misplaced, however. Neither of these cases involved titles confirmed under the 1851 Act. In *New Orleans* v. *United States*, for example, the Board of Commissioners in that case could only make recommendations to Congress, in contrast to the binding effect of a decree issued by the Board under the 1851 Act. Thus, we held in that case that the city of New Orleans could assert public rights over riverfront property which were previously rejected by the Board of Commissioners. *New Orleans* v. *United States*, *supra*, at 733–734. The decision in *Eldridge* v. *Trezevant*, *supra*, did not even involve a confirmatory patent, but simply the question whether an outright federal grant was exempt from longstanding local law permitting construction of a levee on private property for public safety purposes. While the Court held that the federal patent did not extinguish the servitude, the interest asserted in that case was not a "right of permanent occupancy," *Barker* v. *Harvey*, 181 U. S., at 491, such as that asserted by the State in this case.

> presenting them to the commission for consideration, and they could not, therefore, . . . 'resist successfully any action of the government in disposing of the property.' If it be said that the Indians do not claim the fee, but only the right of occupation, and, therefore, they do not come within the provision of section 8 as persons 'claiming lands in California by virtue of any right or title derived from the Spanish or Mexican government,' it may be replied that a claim of a right to permanent occupancy of land is one of far-reaching effect, and it could not well be said that lands which were burdened with a right of permanent occupancy were a part of the public domain and subject to the full disposal of the United States. . . . Surely a claimant would have little reason for presenting to the land commission his claim to land, and securing a confirmation of that claim, if the only result was to transfer the naked fee to him, burdened by an Indian right of permanent occupancy." *Id.* at 491–492.

The Court followed its holding in *Barker* in a subsequent case presenting a similar question, in which the Indians claimed an aboriginal right of occupancy derived from Spanish and Mexican law that could only be extinguished by some affirmative act of the sovereign. *United States* v. *Title Ins. & Trust Co.*, 265 U. S. 472 (1924). Although it was suggested to the Court that Mexican law recognized such an aboriginal right, Brief for Appellant in *United States* v. *Title Ins. & Trust Co.*, O. T. 1923, No. 358, pp. 14–16; cf. *Chouteau* v. *Molony*, 16 How. 203, 229 (1854), the Court applied its decision in *Barker* to hold that because the Indians failed to assert their interest within the timespan established by the 1851 Act, their claimed right of occupancy was barred. The Court declined an invitation to overrule its decision in *Barker* because of the adverse effect of such a decision on land titles, a result that counseled adherence to a settled interpretation. 265 U. S., at 486.

Finally, in *United States* v. *Coronado Beach Co.*, 255 U. S. 472 (1921), the Government argued that even if the landowner had been awarded title to tidelands by reason of a Mexican grant, a condemnation award should be reduced to reflect the interest of the State in the tidelands which it acquired when it entered the Union. The Court expressly rejected the Government's argument, holding that the patent proceedings were conclusive on this issue, and could not be collaterally attacked by the Government. *Id.*, at 487–488. The necessary result of the *Coronado Beach* decision is that even "sovereign" claims such as those raised by the State of California in the present case must, like other claims, be asserted in the patent proceedings or be barred.

These decisions control the outcome of this case. We hold that California cannot at this late date assert its public trust easement over petitioner's property, when petitioner's predecessors-in-interest had their interest confirmed without any mention of such an easement in proceedings taken pursuant to the Act of 1851. The interest claimed by California is one of such substantial magnitude that regardless of the fact that the claim is asserted by the State in its sovereign capacity, this interest, like the Indian claims made in *Barker* and in *United States* v. *Title Ins. & Trust Co.*, must have been presented in the patent proceeding or be barred. Accordingly, the judgment of the Supreme Court of California is reversed, and the case is remanded to that court for further proceedings not inconsistent with this opinion.

*It is so ordered.*

JUSTICE MARSHALL took no part in the decision of this case.