# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2022-SA-01088-SCT

***THE STATE OF MISSISSIPPI AND THE
SECRETARY OF STATE OF THE STATE OF
MISSISSIPPI, THE HONORABLE MICHAEL
WATSON***

***v.***

***JOHN BRET ALDRICH, CITY OF BILOXI,
BILOXI PUBLIC SCHOOL DISTRICT, AND
HARRISON COUNTY, MISSISSIPPI***


| | |
|---|---|
| DATE OF JUDGMENT: | 09/23/2022 |
| TRIAL JUDGE: | HON. JAMES B. PERSONS |
| TRIAL COURT ATTORNEYS: | BEN HARRY STONE |
| | GINA BARDWELL TOMPKINS |
| | DOUGLAS T. MIRACLE |
| | LEE DAVIS THAMES, JR |
| | MARY JO WOODS |
| | JONATHAN PAUL DYAL |
| | MALISSA WILSON |
| | MORGAN ASHLEY MIDDLETON |
| | MICHAEL CLARK McCABE, JR. |
| | DAVID A. WHEELER |
| | TIM C. HOLLEMAN |
| | RONALD G. PERESICH |
| | RONALD GILES PERESICH, JR. |
| | HENRY N. DICK, III |
| | KARL CRAWFORD HIGHTOWER |
| | KATHERINE HEWES HOOD |
| | GERALD HENRY BLESSEY |
| | PETER C. ABIDE |
| | PATRICK TAYLOR GUILD |
| | BRYAN CARL SAWYERS |
| COURT FROM WHICH APPEALED: | HARRISON COUNTY CHANCERY COURT |
| ATTORNEYS FOR APPELLANTS: | KARL CRAWFORD HIGHTOWER |
| | KATHERINE HEWES HOOD |

ATTORNEYS FOR APPELLEES:      DAVID A. WHEELER
                              TIM C. HOLLEMAN
                              MICHAEL E. WHITEHEAD
                              GERALD HENRY BLESSEY
                              CANDACE C. WHEELER
                              PETER C. ABIDE
                              PATRICK T. GUILD
                              HENRY N. DICK, III
                              HOLLIS TAYLOR HOLLEMAN
NATURE OF THE CASE:           CIVIL - REAL PROPERTY
DISPOSITION:                  AFFIRMED - 04/04/2024
MOTION FOR REHEARING FILED:

**BEFORE KITCHENS, P.J., BEAM AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1.     This case is a dispute over roughly one acre of Mississippi coastal land.  In short, John Aldrich and the State disagree over whether the subject property is Aldrich's or State-owned tideland.  Their disagreement is not novel, however, as similar disputes have previously come before this Court.[1]  Here, as before, the primary source of conflict is the map the secretary of state published in 1994 that demarcated the boundaries between private property and Public Trust Tidelands.

¶2.     Via the map, the secretary designated the subject property as State-owned tideland. Aldrich disagreed with the designation however, leading him to challenge the relevant boundary in Harrison County Chancery Court in 1998.  The State then filed a counterclaim,

---

[1] In both ***Bayview Land, Ltd. v. State ex rel. Clark***, 950 So. 2d 966 (Miss. 2006), and ***Secretary of State v. Wiesenberg***, 633 So. 2d 983 (Miss. 1994), this Court considered the boundaries between private property and State-owned tideland.

alleging it held fee simple title to the property.

¶3.     Following more than two decades of inactivity and extended bursts of litigation to be detailed below, the chancellor eventually found in Aldrich's favor in 2022, vesting title in him and adjusting the tideland boundary. Throughout the proceedings, the chancellor made five consequential findings, all of which the State labels as error on appeal. Four of them present issues that can be routinely resolved. The outlier, however, poses a unique issue.

¶4.     Specifically, the chancellor found that a 1784 Spanish land grant, which is the root of Aldrich's deraignment of title, negated the State's claim to fee simple title. This finding carries considerable weight, as it calls into question which lands passed from the federal government to Mississippi upon statehood. This case therefore requires careful historical analysis that balances the interests of private landowners with those of the State. Upon review, however, we find no error and affirm the chancery court's decision.

## FACTS AND PROCEDURAL HISTORY

¶5.     The subject property lies in Biloxi between the southern edge of U.S. Highway 90 and the Mississippi Sound. It is situated well within the ebb and flow of the tides. The State therefore wishes to lay claim to it much to the dismay of Aldrich, whose family ran the Fisherman's Wharf on the property from the 1970s until the restaurant's destruction by Hurricane Katrina in 2005.

¶6.     Before this case arose, however, the Legislature sought to preempt the type of dispute we now consider on appeal. Prior to the enactment of the Public Trust Tidelands Act in

3

1989, questions arose among private landowners regarding what portions of their land were owned by the State as Public Trust Tidelands. The Tidelands Act came in direct response to these questions, one of its ends being to set concrete boundaries that divided private from State-owned property in areas where tides fluctuate. To achieve this end, the Tidelands Act commissioned the secretary of state to draft a preliminary map that drew such boundaries. Regarding the determination of the boundaries, Mississippi Code Section 29-15-7(1) provided in relevant part:

> [t]he preliminary map shall depict the boundary as the current mean high water line where shoreline is undeveloped and in developed areas or where there have been encroachments, such maps shall depict the boundary as the determinable mean high water line nearest the effective date of the Coastal Wetlands Protection Act.[2]

Miss. Code Ann. § 29-15-7(1) (Rev. 2020). Despite this language, the secretary drew the boundary relevant to the subject property based on the historic mean high water line determined in an 1851 coastal survey. This water line set the boundary along U.S. Highway 90, effectively annexing the entirety of the property into the State's tidelands.

¶7.    Upon publication of the map's final, certified draft, the secretary was required to notify private landowners with "properties subject to the trust . . . that their lands [were] subject to the public trust and [were] in violation of the trust." *Bayview Land*, 950 So. 2d at 976. Following the map's final publication in 1994, the secretary notified John Aldrich's

---

[2] "The effective date of the Coastal Wetlands Protection Act was July 1, 1973." *Bayview Land*, 950 So. 2d at 984-85.

4

father, Joe Aldrich, as well as Lady Luck Biloxi, Inc., the lessee of the property at the time, that the property was subject to and in violation of the trust. Joe, John, John's mother, Jackie Aldrich, and Lady Luck then sought to amend the boundary relevant to the property, as was their right pursuant to Mississippi Code Section 29-15-7(4) (Rev. 2020). They were unable to reach an agreement with the secretary to adjust the boundary, however, leaving them no choice but to "commence suit in the appropriate chancery court." *Id.* (citing Miss. Code Ann. 29-15-7(5) (Rev. 2005)).

¶8. On April 3, 1998, the Aldriches and Lady Luck challenged the secretary's map in Harrison County Chancery Court. They (1) alleged the secretary failed to comply with statutory guidelines in drafting the map, (2) claimed the secretary's failure allowed the State to assert dominion over the property, and (3) sought recognition of Joe Aldrich's ownership over the property.

¶9. Shortly thereafter, on May 14, 1998, Joe Aldrich died. That same day, the State filed its answer and counterclaim. In the counterclaim, the State alleged that, according to the Public Tidelands Trust,[3] it held fee simple title to the property. To support its allegation, the State posited that the property was the product of "artificial fill deposited and constructed by parties other than the State in and upon lands that were public trust tidelands and submerged lands held by the State in trust immediately prior to and at the time of filling and

---

[3] The Public Tidelands Trust is the trust in which State-owned tidelands are held for the people of Mississippi.

5

construction." By the State's logic, the property was no more than an intrusion into its tidelands that Aldrich had no claim to.

¶10.    More than a year later, the chancery court sent letters to counsel for both parties on October 6, 1999. The letters notified counsel that the case was stale and that the clerk would be filing a motion to dismiss. The letters also made clear that, if there were objections, they needed to be filed within thirty days. Lady Luck then filed a motion to substitute parties and counsel on October 29, 1999, explaining that, since its lease was transferred to Grand Casinos of Mississippi, Inc. - Biloxi, Grand Casinos was now the real party in interest.

¶11.    In addition to Lady Luck's motion, Grand Casinos sent a letter to the clerk explaining that all parties objected to dismissal. The chancery court entered an agreed order on July 18, 2000, substituting Grand Casinos for Lady Luck and overruling the clerk's motion to dismiss. Following the order, the case idled for fourteen years.

¶12.    Eventually, on November 5, 2014, the State filed a Mississippi Rule of Civil Procedure 41(b) motion to dismiss for lack of prosecution, noting the challengers' failure to initiate any activity following the agreed order. One month later, on December 5, 2014, Henry Laird, who represented Lady Luck circa 1998, objected to the State's motion to dismiss but requested additional time due to difficulties locating documents.

¶13.    On December 9, 2014, the chancery court granted the State's motion, dismissing the 1998 challenge with prejudice. In doing so, the court alleged that the challengers did not file a response to the State's motion to dismiss or seek an extension of time to do so. Notably,

6

however, the court did not address the State's counterclaim.

¶14. On June 16, 2015, the Peoples' Bank of Biloxi, acting as the conservator of Jackie and John Aldrich, filed an answer to the counterclaim. The answer contained essentially the same claims as the original challenge; they were now listed as defenses, however. The answer also addressed the artificial filling issue raised in the counterclaim. The chancellor at the time, Judge Steckler, then filed an order of recusal on October 4, 2017.

¶15. On October 20, 2017, the City of Biloxi filed a motion to intervene as a plaintiff/counter-defendant. The City argued it had an interest in the matter since it was entitled to collect ad valorem property taxes on the subject property. In addition to the motion, the City also answered the State's counterclaim. Harrison County and Biloxi Public School District then followed suit with their own motions to intervene and answers to the State's counterclaim.

¶16. John Aldrich, his mother having passed, singularly filed his amended answer to the State's counterclaim on November 10, 2017. In doing so, he invoked the 1784 Spanish land grant as a defense to the State's claim to fee simple title. On April 16, 2018, the chancery court entered an order granting the Intervenors' motions to intervene.

¶17. Following years of depositions, the case was set for trial on December 8-9, 2021, but was continued to February 25-28, 2022. At trial, the parties argued two primary points of contention: (1) whether the 1784 Spanish land grant was valid and vested title in Aldrich; and (2) whether the property was created by artificial filling, specifically the deposition of oyster

shells and dredge spoils.

¶18. In his final judgment, the chancellor found in the affirmative as to both. He also adjusted the tideland boundary to reflect the shoreline nearest July 1, 1973, which is the same as the current southern boundary of the property. The State now appeals.

## ISSUES

¶19. The State raises five issues on appeal:

1. Whether it was error for the trial court to allow governmental parties to intervene and participate in litigation when they had no interest in the property other than taxation authority.

2. Whether it was error for the trial court to allow Aldrich and Intervenors to challenge the secretary's map after Aldrich's claim had been dismissed with prejudice.

3. Whether it was error for the trial court to find that the Spanish land grant at issue was valid and therefore confirmed title to the property on Aldrich.

4. Whether it was error for the trial court to find that the deposition of oyster shells and dredge spoils created the property, rendering it Aldrich's.

5. Whether it was error for the trial court to find that the property was not Public Trust Tidelands.

## STANDARD OF REVIEW

¶20. In *Bayview Land*, this Court set forth the applicable standard of review:

When we are called upon to review a chancellor's opinion after a plenary trial on the merits of a case, our standard of review is well established. This Court will not reverse the chancellor's findings of fact "unless they are manifestly wrong, not supported by substantial credible evidence, or an erroneous legal standard was applied."

8

*Bayview Land*, 950 So. 2d at 971-72 (quoting *Columbia Land Dev., LLC v. Sec'y of State*, 868 So. 2d 1006, 1011 (Miss. 2004)). "On the other hand, when we review questions of law, a de novo standard of review is applied." *Id.* at 972 (citing *Tucker v. Prisock*, 791 So. 2d 190, 192 (Miss. 2001)).

## DISCUSSION

### 1.    The Intervenors qualified to intervene.

¶21.    This Court has held that "a chancellor's grant of a motion to intervene must be considered under the same standard of review as a chancellor's *denial* of a motion to intervene—abuse of discretion." *Hood ex rel. State Tobacco Litig. v. State ex rel. Barbour*, 958 So. 2d 790, 802 (Miss. 2007). Further, "considerable discretion is given to a trial court in ruling on a motion to intervene." *Id.* (citing *Hayes v. Leflore Cnty. Bd. of Supervisors*, 935 So. 2d 1015, 1017 (Miss. 2006)).

¶22.    The Intervenors all sought intervention of right under Mississippi Rule of Civil Procedure 24(a), or in the alternative, permissive intervention under Rule 24(b). Rule 24(a) provides:

> Upon timely application, anyone shall be permitted to intervene in an action:
>
> (1) when a statute confers an unconditional right to intervene; or
>
> (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicants interest is adequately represented by existing parties.

9

M.R.C.P. 24(a).

¶23. The chancellor ultimately found the Intervenors had standing "as a matter of right" under Rule 24(a)(2). In doing so, he first noted that "a party seeking intervention of right should receive the benefit of the doubt." (citing *Guaranty Nat'l Ins. Co. v. Pittman*, 501 So. 2d 377, 385 (Miss. 1987)). He then cited this Court's holding in *Perry County v. Ferguson*, 618 So. 2d 1270 (Miss. 1993).

¶24. In *Ferguson*, Perry County "claim[ed] intervention of right . . . as a defendant in a Jackson County Circuit Court civil action brought by private parties who [sought] both actual and punitive damages against a paper mill for its discharge of 'toxic . . . substances.'" *Id.* at 1271. The county leased the mill and the land to the company operating the mill, which led the county to argue (1) "substantial monetary judgments in over 160 pending cases could force the mill to close" and affect the county's "interest . . . as project owner[,]" and (2) "lost jobs" would have an "economic impact" on the county. *Id.*

¶25. In denying Perry County's claim to intervention, this Court found that "[e]conomic interest alone is insufficient; a legally protected interest is required for intervention under Rule 24(a)(2)." *Id.* at 1272 (citing *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 466 (5th Cir. 1984)). More importantly, however, this Court noted that the county's interest was "already adequately represented by the existing party defendants[—the company operating the mill]." *Id.* at 1273. Specifically, "Perry County ha[d] the same ultimate objective as [the company,]" and "those interests [were] adequately

10

represented by [the company] absent a showing of adversity of interest . . . ." ***Id.*** The county therefore had no reason to intervene other than economic interest, which led this Court to deny intervention. ***Id.***

¶26.    Here, the Intervenors no doubt have an economic interest—they seek to preserve their right to collect ad valorem property taxes and to retain previously collected taxes—but where their claim to intervention differs from the county's in ***Ferguson*** is in their "adversity of interest" with John Aldrich. ***Id.*** The chancellor addressed this adversity in his grant of the Intervenors' motions:

> In the event the [secretary of state] is granted the relief he seeks . . . John Bret[] Aldrich . . . asserts a claim against [the secretary of state] for all ad valorem taxes previously assessed on the subject property as fee simple fastlands by the Harrison County Tax Assessor since the date of the issuance of the Final Map of Public Trust Tidelands in 1994 in an amount to be determined by this court. In the event of such a claim by [Aldrich] against the [secretary of state] it is reasonable to assume that [Aldrich] would also assert a claim against the three Intervenors as the ultimate recipients of the ad valorem tax payments made by him or that [the secretary of state] would join the Intervenors as third party defendants in any such action. For this reason, the court finds that the interest of the Intervenors may not be adequately represented by the existing Counter-defendant, Mr. Aldrich.

¶27.    The soundness of the chancellor's logic is readily apparent. A final judgment in the secretary's favor would no doubt have put the Intervenors and Aldrich at odds with one another since Aldrich would likely have sought reimbursement of the taxes he had paid on the property. The Intervenors and Aldrich were thus no more than allies of convenience. From the Intervenors' perspective, it was prudent to join Aldrich, as he represented continued monetary gain for them. Had he lost, however, his attraction would have quickly faded, and

11

he would have become a potentially litigious adversary.

¶28.   We therefore find the chancellor did not abuse his discretion. The chancellor instead correctly determined that, unlike in ***Ferguson***, "[o]n [the] unique facts and giving the Intervenors the benefit of any doubt . . . the Intervenors have an interest in the present litigation which may be materially affected by its outcome and which cannot be adequately represented by another party to the action." Further, "the subject matter of [the] litigation is of significant importance and potential impact to the Mississippi Gulf Coast."

¶29.   Specifically, beyond ad valorem taxes, the Intervenors have at least five real property and governmental concerns dependent on the outcome of this case, including (1) private-property values, (2) development opportunities, (3) bond ratings, (4) debt obligations, and (5) zoning restrictions. Were the State to prevail, either the Intervenors' control over or their benefit from any of the five would certainly diminish. Considering this risk, which amounts to much more than mere economic interest, as well as Aldrich's inability to adequately represent the Intervenors, the chancellor acted well-within his "considerable discretion" in granting the Intervenors' motions. ***Hood***, 958 So. 2d at 802 (citing ***Hayes***, 935 So. 2d at 1017).

### 2.     The State's dismissal with prejudice issue is waived.

¶30.   The State claims on appeal that, at the moment the chancery court dismissed "Aldrich's claims with prejudice for lack of prosecution," Aldrich "lost" his option to challenge the secretary's map. Further, "[b]ecause Aldrich's challenge to [the map] had been

12

dismissed with prejudice, the trial court was no longer able to move the boundary between Public Trust Tidelands and private property established by [the map]." In the State's opinion, "[t]he trial court . . . allowed Aldrich to pursue his previously-dismissed map challenge claim as part of his defense to the State's [c]ounterclaim, and thus committed reversible error."

¶31. Despite its numerous claims, however, the State fails to cite any authority in its briefs to support its contentions that the dismissal of Aldrich's challenge (1) had preclusive effect and (2) prevented Aldrich from challenging the boundary as a defense to the State's counterclaim. "[I]n the absence of meaningful argument and citation of authority, this Court generally will not consider the assignment of error." *Patton v. State*, 109 So. 3d 66, 75 (Miss. 2012) (internal quotation marks omitted) (quoting *Randolph v. State*, 852 So. 2d 547, 558 (Miss. 2002)). The issue is therefore waived. *Hale v. State*, 191 So. 3d 719, 724 n.1 (citing *Grey v. Grey*, 638 So. 2d 488, 491 (Miss. 1994)). And we do not disturb the chancellor's finding that, following the dismissal of Aldrich's original challenge, "the current state of pleadings provided a basis for the case to proceed on the Court's docket."

### 3. The 1784 Spanish land grant is valid and vests title in Aldrich.

¶32. When our state was founded in 1817, it received its lands from the United States government via two public trusts. *Cinque Bambini P'ship v. State*, 491 So. 2d 508, 511 (Miss. 1986). Of course, the lands that became Mississippi were not always the United States government's to distribute. Over many decades, they passed through the hands of native peoples, as well as foreign sovereigns, before ending up under our nation's domain.

13

¶33. Today, a number of coastal landowners, including Aldrich, can trace their titles to a time when Spain controlled the lands that now comprise the Mississippi coast. Aldrich's title in particular links directly to a 1784 Spanish land grant through which King Charles III of Spain transferred a large tract of land, which included the subject property, to one Jacques Mathurin. We are now tasked with deciding whether to honor this land grant and, in doing so, decree that certain coastal lands were not the United States government's to endow to Mississippi upon statehood.

¶34. We first address this Court's findings in *Cinque Bambini*. There, this Court considered the validity of Spanish land grants in a similar context to the present one. *Id.* at 518. The land grants in question, however, dated from April 15, 1813. *Id.* This Court therefore found they had no force and effect since they "came too late." *Id.* The tardiness of the land grants was due to three historical considerations: (1) "[o]n October 27, 1810, President Madison proclaimed West Florida south of the 31st parallel a part of the United States"; (2) "[o]n February 12, 1812, the Congress authorized the president to take West Florida below the 31st parallel"; and (3) "[o]n May 14, 1812, the area with which [this Court was] concerned was formally annexed to the Mississippi Territory." *Id.* The combination of the three made it clear that the lands in question were not Spain's to grant in 1813, rendering the land grants invalid. *Id.* We therefore are not today bound by this Court's holding in *Cinque Bambini*, as the Mathurin grant predates the above considerations by more than twenty years.

14

¶35.    In reaching its conclusion in *Cinque Bambini*, this Court also considered two United States Supreme Court cases: *Pollard v. Hagan*, 44 U.S. 212, 11 L. Ed. 565 (1845), and *Henderson v. Poindexter's Lessee*, 25 U.S. 530, 6 L. Ed. 718 (1827).  While not dispositive, this Court admittedly found these cases "suggested . . . that no recognition is accorded titles to lands in Spanish West Florida held under Spanish grants after 1783."  *Cinque Bambini*, 491 So. 2d at 518 (citing *Pollard*, 44 U.S. at 226; *Henderson*, 25 U.S. at 535-36).  But, more importantly, it noted that *Pollard* and *Henderson* "factually concern lands and waters above 31 degrees North latitude[;]" and "[c]oncedely, the Spanish claim to West Florida below the 31st parallel was far more legitimate that [sic] above it."  *Id.* at 518.

¶36.    The difference in legitimacy between Spain's two claims is evidenced by the relative ease with which the United States acquired West Florida above the thirty-first parallel.  The United States acquired that territory in the 1783 Treaty of Paris between the United States and Great Britain.  Article II of the treaty provided:

> And that all disputes which might arise in future, on the subject of the boundaries of the said United States, may be prevented, it is hereby agreed and declared, that the following are, and shall be their boundaries[:] . . . thence on a due west course to the river Mississippi; thence by a line to be drawn along the middle of the said river Mississippi until it shall intersect the nothernmost part of the thirty-first degree of north latitude.  South, by a line to be drawn due east from the determination of the line last mentioned, in the latitude of thirty-one degrees north of the Equator . . . .

Treaty of Paris, Gr. Brit.-U.S., art. II, Sept. 3, 1783, 8 Stat. 80.

¶37.    From 1783 to 1795, Spain questioned the boundaries set forth in Article II and "maintained perseveringly her pretensions to extend farther north."  *Henderson*, 25 U.S. at

15

534. But her resistance was effectively put to rest in the 1795 Treaty of San Lorenzo. There, as the United States Supreme Court reiterated in **Henderson**, the United States and Spain agreed

> that the southern boundary of the United States, which divides their territory from the Spanish colonies of East and West Florida, shall be designated by a line beginning on the river Mississippi, at the northernmost part of the 31st degree of latitude north of the equator, which from thence shall be drawn due east to the middle of the river Apalachicola, or Catahouchee[4] . . . .

**Id.** Further, the treaty "declare[d] . . . that the line which was described in the treaty of peace between Great Britain and the United States as their southern boundary, shall be the line which divides their territory from East and West Florida." **Id.**

¶38. In the aftermath of the treaty, the United States notably encountered little resistance from Spain regarding her claim to the territory above the thirty-first parallel. In contrast, acquiring West Florida below the thirty-first parallel proved a much more contentious endeavor. The United States Supreme Court detailed the struggle over the territory in **United States v. States of La., Tex., Miss., Ala. & Fla.**, 363 U.S. 1, 80 S. Ct. 961, 4 L. Ed. 2d 1025 (1960), *supplemented sub nom.* **United States v. Louisiana**, 382 U.S. 288, 86 S. Ct. 419, 15 L. Ed. 2d 331 (1965). The Court recounted:

> On September 3, 1783, Great Britain and Spain signed a treaty by which Great Britain ceded ["[t]he territory which now comprises the part of Mississippi lying south of the 31st parallel . . . ."] to Spain as part of a cession embracing all of western and eastern Florida.

---

[4] The Catahouchee is commonly referred to today as the Chattahoochee.

16

By the Treaty of San Ildefonso, signed October 1, 1800, Spain ceded to France "the colony and province of Louisiana." In the Treaty of Paris of April 30, 1803, France ceded Louisiana to the United States to the same extent as France had acquired it by virtue of the Treaty of San Ildefonso. A dispute arose between the United States and Spain as to whether, by the Treaty of San Ildefonso, Spain had conveyed to France any land east of the Mississippi River (including any part of West Florida), and therefore whether France could have subsequently passed that territory to the United States in the Treaty of Paris. On October 27, 1810, President Madison claimed the right to possession of the area, and on May 14, 1812, Congress made it part of the Mississippi Territory. On March 1, 1817, Congress authorized the creation of the State of Mississippi, specifically setting out its boundaries, in part as follows:

> "thence due south to the Gulf of Mexico, thence westwardly, including all the islands within six leagues of the shore, to the most eastern junction of Pearl river with Lake Borgne . . . ."

The Mississippi Constitution, approved by the Act admitting the State to the Union on December 10, 1817, contained an identical provision. Finally, by the Treaty of February 22, 1819, Spain purported to cede East and West Florida to the United States.

*Id.* at 80-81 (citations omitted).

¶39. Considering this contentious chronology, we see no reason to apply this Court's interpretation of *Pollard* and *Henderson* in *Cinque Bambini* since both the legitimacy of Spain's claims to and the history of the territories above and below the thirty-first parallel so starkly differ. Admittedly, based on the 1795 Treaty of San Lorenzo, the United States Supreme Court held in *Henderson* "that Spanish grants, made after the treaty of peace [1783], can have no intrinsic validity, and the holders must depend for their titles on the laws of the United States." *Henderson*, 25 U.S. at 536. But again, this holding and the *Pollard* holding were made entirely in the context of the territory above the thirty-first parallel.

17

¶40.   As the chancellor rightly observed in his final judgment, the *Cinque Bambini* interpretation therefore amounts to nothing more than dicta and has no bearing on the Mathurin grant since it concerns property below the thirty-first parallel.  We thus further analyze the history of the relevant portion of Spanish West Florida to determine the Mathurin grant's validity.

¶41.   Although Spain continued to lay claim to the Mississippi coast through 1819, we need only consider the status of the coast in 1803 and in the years preceding.  Regarding this period, three primary questions come to the fore.  First, whether France transferred to the United States via the 1803 Louisiana Purchase lands east of the Mississippi River.  Second, if France indeed transferred such lands, whether they included the property in question.  And third, whether the transfer was subject to prior Spanish land grants.

¶42.   The United States Supreme Court answered the first two questions in *Foster v. Neilson*, 27 U.S. 253, 7 L. Ed. 415 (1829), *overruled by* *United States v. Percheman*, 32 U.S. 51, 8 L. Ed. 604 (1833).  At the outset, the Court remembered:

> By the treaty of St. Ildefonso, made on the 1st of October 1800, Spain ceded Louisiana to France; and France, by the treaty of Paris, signed the 30th of April 1803, ceded it to the United States.  Under this treaty the United States claimed the country between the Iberville and the Perdido.  Spain contended that her cession to France comprehended only that territory which at the time of cession was denominated Louisiana, consisting of the island of New Orleans, and the country which had been originally ceded to her by France, west of the Mississippi.

*Id.* at 253.  With this disagreement in mind, the Court posed the question: "to whom did the country between the Iberville and Perdido belong after the treaty of St[.] Ildefonso?"  *Id.*

18

The Court then "determined . . . that the portion of the State of Mississippi south of the 31st parallel passed to the United States as part of the Louisiana Purchase under the Treaty of Paris in 1803, and not as part of West Florida under the Spanish Treaty of 1819." *States of La., Tex., Miss., Ala. & Fla.*, 363 U.S. at 81 (citing *Foster*, 27 U.S. at 253).

¶43.    While it is a common misconception that the territory that later became the Mississippi coast was not included in the Louisiana Purchase, the eastern boundary of the purchase indeed extended all the way to the Perdido River in the lands that would form Alabama.  As the Court in *Foster* found:

> the country east of the island of Orleans, including Mobile . . . to the Perdido, was from 1682 to 1763 in possession of France under the name of Louisiana . . . [and] it was ceded and intended to be ceded to her again by Spain in 1800, and by France to the United States in 1803.

*Foster*, 27 U.S. at 287.  We therefore conclude that France transferred the property at issue to the United States in 1803.  The only question that then remains is the third: whether this transfer was subject to prior Spanish land grants.

¶44.    In *Cinque Bambini*, this Court explained: "[i]f, at the time of acquisition by the United States in its sovereign capacity, property was already privately owned, it follows on reason that the title was never in the United States and therefore could not have been held by the United States in trust nor thereafter at statehood granted to the state." *Cinque Bambini*, 491 So. 2d at 518.

¶45.    Again, as the United States Supreme Court recounted, "[o]n September 3, 1783, Great Britain and Spain signed a treaty by which Great Britain ceded ["[t]he territory which now

19

comprises the part of Mississippi lying south of the 31st parallel . . . ."] to Spain as part of a cession embracing all of western and eastern Florida." ***States of La., Tex., Miss., Ala. & Fla.***, 363 U.S. at 80-81 (citations omitted). Since King Charles III issued the land grant conveying the subject property to Mathurin one year later in 1784, the land grant was clearly valid and transferred the property to a private owner.

¶46. We turn now to Aldrich's deraignment of title. Central to Aldrich's deraignment is a quitclaim deed issued by the United States to Charles McCaleb on June 15, 1844. Regarding the quitclaim deed, the chancellor found in his final judgment:

> The United States of America in the deraignment of title in its 1844 quitclaim deed to McCaleb, confirmed and recognized Mathurin's original title to the 511.34 acres some 60 years after the 1784 land grant to Mathurin. It then follows that the United States in 1817 had nothing to convey or grant to the Mississippi concerning any property included in the Spanish land grant. The quit claim deed to McCaleb further provides that neither the United States or any person ". . . claiming under it may or can set up any right or title thereto." The Court finds that by this provision the United States recognizes that Mathurin acquired valid title to the 511.34 acres to the exclusion of any claim by the United States. Therefore, at Mississippi's 1817 admission to the Union the federal government did not own or claim any right or title to the land which is the subject of this litigation and could not convey in trust or otherwise transfer title to the State of the land at issue here.

¶47. In objection to the chancellor's finding, the State cites ***Cinque Bambini*** on appeal. There, this Court pointed out that "[a]n ordinary federal patent purporting to convey tidelands located within a state to a private individual is invalid . . . ." ***Cinque Bambini***, 491 So. 2d at 517-18 (internal quotation marks omitted) (quoting ***Summa Corp. v. California ex rel. State Lands Comm'n***, 466 U.S. 198, 205, 104 S. Ct. 1751, 1756, 80 L. Ed. 2d 237, 243

(1984)).  It continued, "[i]f the federal patent was granted *after* statehood, it was a nullity as it necessarily purported to operate upon interests in real property which, at least insofar as federal law was concerned, had been conveyed to the states in trust—and irrevocably so." *Id.* at 518.

¶48.   The State would have us interpret this language to undermine McCaleb's quitclaim deed.  But such an interpretation would require us to ignore the very next sentence in ***Cinque Bambini***, which reads, "[t]hese principles hold only with respect to property fee simple title to which was in the United States at and prior to statehood." *Id.*  This qualification directly negates the State's argument against the McCaleb quitclaim deed because the deed, with respect to the land at issue at least, pertained to property that was not "in the United States at and prior to statehood." *Id.*

¶49.   We therefore see no reason to deviate from the chancellor's finding with respect to the quitclaim deed.  The deed only strengthens Aldrich's deraignment of title.  It represents the United States' affirmative recognition of the Mathurin grant's validity and of the grant's bestowing the property to a private landowner.  We therefore affirm the chancellor's finding that the Mathurin grant is valid and vests title in Aldrich.

### 4.     The deposition of oyster shells and dredge spoils created the property, rendering it Aldrich's.

¶50.   The validity of the Mathurin grant and Aldrich's deraignment of title confirmed, the remaining questions are (1) whether the secretary properly designated the tideland boundary, and (2) whether the land generated by artificial filling accrued to Aldrich as the upland

21

landowner or to the State.

¶51.     In **Bayview Land**, the inconsistency between the secretary's mapping process and the guidelines set forth in Mississippi Code Section 29-15-7(1) was essentially the same as it is in this case.  There, "the Secretary of State use[d] as his beginning point the date Mississippi entered the Union in 1817." **Bayview Land**, 950 So. 2d at 980.  And "[f]ollowing the history of the land up to the present day, the Secretary of State relie[d] on a map from 1851 to be of great evidentiary value and note[d] that after the early 1880s, the shape of the land bordering the water began to change because of artificial accretions." **Id.**  This Court ultimately found the secretary in error, however, holding that "the correct standard to use was the mean high water line nearest to July 1, 1973 . . . ." **Id.** at 984.

¶52.     On appeal, the State tries to distinguish this case from **Bayview Land**.  It argues two alleged discrepancies: (1) "Aldrich's claim challenging the Final Map had been dismissed with prejudice prior to trial, and thus, the boundary between Public Trust Tidelands and private property was conclusively established and depicted by the Final Map, and no longer subject to revision[;]" and (2) unlike in **Bayview Land**, "no party asserted that the boundary line between Public Trust Tidelands and private property at the Subject Property is the mean high water line (current as of 1973)."

¶53.     This Court's holding in **Bayview Land** directly contradicts the first discrepancy.  There, this Court addressed the process by which landowners may challenge the final map:

> [Mississippi Code Section 29-15-7(5)] clearly provides that "[i]n any such action, the state shall have the burden of proof by a preponderance of the

22

evidence that any such land is subject to the trust." *The State Carries this statutorily required burden of proof regardless of whether the judicial proceedings are commenced by the State or by the individual landowner.* This Court has stated, "[a]fter the preliminary map is drawn using the mean high water line in developed areas as of July 1, 1973, the burden of proof is on the Secretary of State to show that any artificial accretion occurring prior to July 1, 1973, was not done pursuant to a constitutional legislative enactment and for a higher public purpose."

*Bayview Land*, 950 So. 2d at 977 (second & third alterations in original) (emphasis added) (citations omitted).

¶54. That the challenge to the boundary ultimately came in the form of Aldrich's answer to the State's counterclaim is therefore of no consequence. The State still carried the "statutorily required burden of proof" if it wished to claim the land as Public Trust Tidelands. *Id.* Further, the State's attempt to pass off the boundary promulgated in the secretary's final map as undisputable and subsequently seal itself off from any challenge is unfounded. Incorrectly drawing the map and having a challenge to it dismissed does not amount to an automatic transferral of fee simple title to the State. Such a transfer requires no satisfaction of the burden of proof, directly contradicting Mississippi Code Section 29-15-7(5) (Rev. 2020).

¶55. As to the second alleged discrepancy, the record clearly indicates otherwise. Aldrich raised the issue of the secretary not following the statutory guidelines for drawing the boundary in his answer to the State's counterclaim. In doing so, he specifically asserted that "the 1973 mean high water line is the proper boundary between public trust and private fastlands." Further, the location of the tideland boundary was deliberately litigated at trial.

23

No evidence therefore exists to support the State's allegation that Aldrich did not claim the 1973 mean high water line to be the boundary line.

¶56.   Notwithstanding the arguments of the State, we defer to this Court's holding in *Bayview Land* for guidance on resolving the location of the boundary.  There, this Court noted:

> "There is no constraint on the final map to include or exclude any lands which have been artificially filled prior to 1973.  However, if a landowner can show that this artificial filling was done pursuant to a legislative act, *or* for a high public purpose, the 1973 mean high water line should remain in tact." [*Wiesenberg*, 633 So. 2d at 992].  The State, throughout the life of these civil proceedings, was shouldered with the preponderance of the evidence burden of proof.  Here that burden was to show that any pre-1973 accretions were "not done pursuant to a constitutional legislative enactment *and* for a higher public purpose."  *Id.* (emphasis added).

*Bayview Land*, 950 So. 2d at 982.  With the above in mind, this Court ultimately found that "the State failed to meet that burden at trial and made no attempt to show on appeal how that burden was met."  *Id.*  The boundary was therefore amended to "the mean high water line nearest the date of July 1, 1973, to be determined by the chancellor."  *Id.* at 990.

¶57.   Here, as the artificial filling question is not a legal question, but a factual question, we are limited to an analysis of whether the chancellor abused his discretion in his findings of fact regarding whether the State met its burden of proof that the filling was "not done pursuant to a constitutional legislative enactment and for a higher public purpose."  *Id.* at 978-79 (internal quotation marks omitted) (quoting *Wiesenberg*, 633 So. 2d at 992).

¶58.   Concerning the facts, this Court's holding in *Bayview Land* offers further guidance.

24

As the chancellor explained in his final judgment,

> [t]he evidence in this case is virtually the same as in **Bayview Land**, *supra*. The main factual distinction, which makes no difference to these findings and this Judgment, is that the subject property in Aldrich is on the Biloxi peninsula's southern waterfront at Point Cadet but the subject property in the **Bayview Land** site is on the Back Bay of Biloxi on the northern waterfront of the peninsula. The historic oyster canneries and related industries on these two sites have different names, but they operated during the same time period for many decades under the same State mandates to store oyster shells on site and return them to the public reefs.

¶59. The time period to which the chancellor refers came in the early years of the twentieth century. In those years, "the State maintained a program jointly with the oyster canneries to replant oyster shells on reefs in trust waters." **Bayview Land**, 950 So. 2d at 982. In **Bayview Land**, this Court delineated one of the State's mandates for the management of oyster shells:

> For example, Miss. Code, 1930, § 6881, provided, inter alia, that twenty-five percent of all oyster shells which were taken from the public reefs were declared to be the non-transferable property of the state and were to be delivered to the sea-food commission by stock-piling the shells at the place of business of the oyster dealer or factory. An oyster dealer's failure to comply with this statutory mandate was a misdemeanor subject to payment of a fine.

*Id.*

¶60. Here, as in **Bayview Land**, the private landowner, in this case Aldrich, introduced considerable evidence that the subject property was the product of such oyster shells, which were deposited by the process of wharfing out—"the accumulation of oyster shells over time" which "establish[es] or affix[es] to the land a permanent structure to some point within a navigable body of water"—carried out by oyster canneries. **Bayview Land**, 950 So. 2d at 968-69.

25

¶61. The evidence introduced at trial included: (1) photographs of mountains of oyster shells at factories in the area; (2) maps produced by The Sanborn Map Company that (a) evince the progression of artificial accretions that extended the subject property waterward from 1914-41, and (b) confirm the Johnson Fish & Oyster Co.'s presence on the subject property; (3) City Directories from 1922-23, 1927, and 1931 that (a) list the Johnson Fish & Oyster Co. as the occupant of the subject property, and (b) confirm the presence of a fueling dock operated by the Johnson Oil Co. for use by harvesting vessels that transported oyster shells; (4) a report generated by Eustis Engineering, LLC, that details soil borings from the subject property that contained evidence of various soil layers composed of oyster shells; (5) the testimony of Brian Deschamp that the Eustis Engineering report revealed that the soil contained oysters shells; and (6) a report prepared for the State by Klaus Meyer-Arendt in 1995 that depicts accretions from oyster shells in the area of and including the subject property.

¶62. In addition to the oyster shell evidence, evidence was also introduced as to whether the subject property was the product of dredge spoils deposited by the United States Army Corps of Engineers. The evidence included: (1) minutes from the Biloxi City Council in 1939 that document the City aiding the Corps of Engineers in its dredging of the channel south of Point Cadet and in its deposition of the dredge spoils along the shoreline that includes the subject property; (2) a 1940 report from the United States Army Chief of Engineers that describes the dredge project and the deposition of dredge spoils in the area of

26

the subject property; (3) 1940 *Daily Herald* articles that report the dredge project and the deposition of dredge spoils in the area of the subject property; (4) the Eustis Engineering report, which evidences dredge spoils in various soil samples taken from the subject property; (5) the testimony of Brian Deschamp that the Eustis Engineering report revealed that the soil contained dredge spoils; and (6) Henry Seawell's expert testimony that the Eustis Engineering report revealed that much of the fill from the subject property was consistent with dredged material.

¶63. The above evidence overwhelmingly supports the chancellor's finding of fact that "[t]he State, at trial, failed to produce evidence meeting its burden of proof." The deposition of both the oyster shells and the dredge spoils was clearly done either "pursuant to a constitutional legislative enactment or for a higher public purpose." *Bayview Land*, 950 So. 2d at 980.

¶64. Regarding the oyster shells, as this Court found in *Bayview Land*, "artificial accretions (primarily oyster shells) constitute[] a 'specific alteration of specific public trust tidelands' which 'serve[] a higher public interest in compliance with the public purposes of the public trust in which such tidelands are held.'" *Id.* at 982 (quoting Miss. Code Ann. § 29-15-3(1)). Further, the deposition of oyster shells is "consistent with our common law and legislative enactments" since this Court "recognized such higher public interests and purposes as fishing and the enhancement of aquatic, avarian and marine life and sea agriculture in *Wiesenberg*, 633 So. 2d at 988-89 (citing *Cinque Bambini*, 491 So. 2d at

27

512)." ***Bayview Land***, 950 So. 2d at 982.

¶65.    Regarding the dredge spoils, they were the direct product of the dredging of a navigation channel and were therefore removed and placed at the subject property in the aid of navigation and commerce.  And this Court has found that both navigation and commerce are valid public purposes.  ***Cinque Bambini***, 491 So. 2d at 512 (citing ***Rouse v. Saucier's Heirs***, 166 Miss. 704, 146 So. 291 (1933)).

¶66.    The depositions of the oyster shells and of the dredge spoils were also done by third party strangers—the companies involved in wharfing out and the Corps of Engineers, respectively.  This Court held in ***Bayview Land*** that "accretions caused by third-party strangers to the upland title will vest in the upland owner[.]" ***Bayview Land***, 950 So. 2d 984. Further, this Court held in ***Moore v. Kuljis***, 207 So. 2d 604, 616 (Miss. 1967), that artificial accretions resulting from dredge spoils accrue to the upland landowner.

¶67.    The artificial filling therefore clearly accrues to Aldrich as the upland landowner.  The State presented minimal evidence at trial to satisfy its burden of proof; and, on appeal, it desperately tries to poke holes in the compelling evidence introduced at trial.  Because (1) the subject property is located in a developed area, (2) the State failed to meet its burden of proof, and (3) the artificial filling occurred prior to 1973, the mean high water line nearest July 1, 1973, should clearly be the tideland boundary.  ***Bayview Land***, 950 So. 2d at 977. The chancellor was therefore justified in amending the boundary to reflect the same.

5.      **The property is not Public Trust Tidelands.**

28

¶68. The State tacks on this final issue to restate its argument that "the boundary between Public Trust Tidelands and private property was conclusively established by the Final Map and became immovable." According to the State, when it "admitted its Final Map into evidence," it met its burden of proof to show "that the Subject Property is public trust tidelands . . . ."

¶69. We discredited this argument above and therefore move to the final issue requiring resolution—the chancellor's finding "that as a matter of law the State is estopped from claiming any portion of the Aldrich property that lies north of the current shoreline, which is also the mean high water line boundary between privately owned uplands and Public Trust Tidelands."

¶70. In the past, this Court has sparingly applied the doctrine of equitable estoppel, especially in matters involving the State. *See Cinque Bambini*, 491 So. 2d at 521. Here, applying the doctrine is unnecessary since we have already established the State has no claim to the subject property. "It is axiomatic that statements which are unnecessary to a court's ruling are *dicta*." **Miss. Dep't of Mental Health v. Lamar Cnty. (In re C.W.)**, 250 So. 3d 1248, 1254 (Miss. 2018) (citing **McKibben v. City of Jackson**, 193 So. 2d 741, 744 (Miss. 1967)). Further, "[t]he doctrine of equitable estoppel is not applied except when to refuse it would be inequitable." **PMZ Oil Co. v. Lucroy**, 449 So. 2d 201, 206 (Miss. 1984) (quoting **McLearn v. Hill**, 267 Mass. 519, 524, 177 N.E. 617, 619, 77 A.L.R. 1039 (1931)). Because the issues have been sufficiently decided without the doctrine's application, it is not

inequitable in this case to refuse to apply it. We therefore (1) refuse to apply the doctrine and (2) decline to address whether the chancellor's finding was correct because the chancellor's application of the doctrine was redundant under these circumstances.

## CONCLUSION

¶71. The secretary of state failed to follow statutory guidelines in drafting both the preliminary and the final map. Further, the State failed to meet its burden of proof that the artificial filling was not the product of the deposition of oyster shells and dredge spoils. Both the Mathurin grant and the history of the subject property support a finding that the property belongs to Aldrich, and it would be a travesty of justice to deprive Aldrich of the property his family has enjoyed the fruits of for decades based solely on a misdrawn map. We therefore find no error and affirm the chancellor's decision.

¶72. **AFFIRMED.**

**KITCHENS AND KING, P.JJ., COLEMAN, MAXWELL, BEAM AND CHAMBERLIN, JJ., CONCUR. GRIFFIS, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. RANDOLPH, C.J., NOT PARTICIPATING.**